**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Claudy Ray HERRON and Johannes
Faul, Defendants-Appellants.**

**No. 86–1413.**

United States Court of Appeals,
Fifth Circuit.

Aug. 6, 1987.

Before GARZA, WILLIAMS and GARWOOD, Circuit Judges.

ON PETITION FOR REHEARING

GARZA, Circuit Judge:

The petition for rehearing is GRANTED. The previous panel opinion appearing at 816 F.2d 1036 is withdrawn. The following opinion shall be substituted in its place:

Johannes Faul and Claudy Ray Herron, defendants-appellants, challenge the sufficiency of the evidence to support their wire fraud convictions for fabricating and participating in a scheme designed to facilitate a large cash deposit in an American bank without triggering a Currency Transaction Report (CTR). Faul also challenges his conviction for conspiracy to defraud the United States. However, this Court considered *sua sponte* whether the facts alleged in the indictment constitute a cognizable violation of the wire fraud statute, 18 U.S.C. § 1343. We find that the indictment did not set forth a prosecutable wire fraud offense and therefore reverse the wire fraud convictions entered below. We affirm Faul's conviction under 18 U.S.C. § 371 for conspiracy to defraud the United States.

## BACKGROUND

Internal Revenue Service (IRS) informant Nathan Shay first approached a banker, David J. Fisher, in August of 1985 to inquire about depositing large sums of cash in Fisher's bank. Shay claimed he and a partner had invested in a high technology bean-sprout farm which was generating a substantial amount of cash. Shay told Fisher that he wanted to deposit the proceeds from the farming venture in a manner that would prevent the bank from filing a CTR with the U.S. Treasury Depart-

Frank Jackson, Bruce Anton, Dallas, Tex., for Herron, Faul.

Marvin Collins, U.S. Atty., Terry K. Ray, Sidney Powell, Asst. U.S. Attys., Dallas, Tex., for U.S.

ment.[1] Fisher consulted with other bank officers and then declined to become involved. Fisher did inform Johannes Faul, known to Fisher as a financial consultant, about Shay's desire to make large deposits and avoid detection by the Treasury Department. Faul met with Shay and his partner "Thomas Kent"[2] and proposed a number of plans wherein Faul would obtain a percentage of the total cash involved by arranging to have the currency deposited in a domestic bank without a CTR being filed. This was what Shay and Kent wanted because, they said, they had not paid taxes on the approximately one million dollars they wanted to deposit in a bank account without "raising any red flags" to the IRS.

Faul told Claudy Ray Herron about Shay's situation during a conversation held in August of 1985. Later, on October 21, 1985, Herron placed a phone call from Faul's office in Dallas to Edward Steph in London, England. Steph was a boyhood friend of Herron's and a London financial consultant. Herron told Steph that there were some people in the United States who wanted to move millions of dollars overseas and establish a banking relationship there. Faul then discussed this matter over the telephone with Steph and John-Seager Green, who was Steph's partner and banker. Green indicated that the minimum amount had to be $500,000, not the $100,000 amount Faul had suggested, and he asked Faul if the funds were legitimate. On October 23, 1985, Faul met with Kent to discuss the plan to launder the money through England. The money would go to London and then to Switzerland to be deposited in a Swiss bank; this bank would then wire the money back disguised as a loan or issue certified checks to be brought back and deposited in the United States. Herron was to be used to transport the money to London.

Steph and Green arrived in Dallas on November 3, 1985, travelling on tickets prepaid by "expense account" money Faul had obtained from Kent. Since Fisher had decided not to open an account for Shay and Kent, Faul introduced Kent to Gary Tipton, another Texas banker, in an effort to provide Kent and Shay with a place to deposit their overseas cashier's checks. Faul advised Kent not to tell Tipton about the laundering plan; instead, Kent should make Tipton think the money had originated from overseas instead of being transferred there from the United States. If Tipton knew that the wire transfer or certified checks were generated from money originally within the United States, he, like Fisher, would have recognized the scheme as one attempting to avoid detection by the IRS. Kent did as instructed by Faul and made ambiguous representations about the origin of the funds he wanted to deposit. Tipton agreed to accept Kent as a client, and Kent deposited $1,000 in Tipton's bank on November 6, 1985, to open up the account into which the overseas checks ultimately would be deposited. On the same day, Faul asked Kent to sign a letter drafted by Faul which set forth an "agreement" between the two. Faul told Kent it was

---

1. A financial institution must file a CTR on "each deposit, withdrawl, exchange of currency ... or transaction in currency of more than $10,000." 31 C.F.R. § 103.22(a)(1); *see* 31 U.S. C.A. § 5313(a). A transaction in currency is defined as a "transaction involving the physical transfer of currency from one person to another. A transaction which is a transfer of funds by means of bank check, bank draft, wire transfer, or other written order, and which does not include the physical transfer of currency is not a transaction in currency...." 31 C.F.R. § 103.11(1).

In practice, the regulations require that a CTR be filed for every deposit of cash or currency which exceeds $10,000. If the deposit involves a monetary instrument which represents cash or currency, the financial institution that *re-*

*ceives* such a deposit is not required to file a CTR because the financial institution that *issued* the bank draft, certified check, etc. would have a legal duty to file a CTR when the cash or currency was converted into a paper document. The CTR filing leaves the government a "paper trail" in order to follow the unusual movement of large amounts of money. *See California Bankers Assn. v. Shultz,* 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974).

2. IRS agent Thomas Kemp used the alias of "Thomas Kent" when dealing with Faul and the other principals involved in this undercover investigation. Kent secretly recorded all of the discussions he had concerning this proposed laundering scheme.

"no big deal"—he indicated that he needed the letter to satisfy Steph and Green, who had voiced concern over the propriety of the proposed transaction.[3] Thereafter, Faul assured Green that the transaction was legal and showed him the letter endorsed by Kent. Green then decided he would carry the money instead of Herron. At a Dallas motel, Kent gave Green a suitcase containing $500,000 in cash. It is uncontroverted that Faul specifically told Green to declare the money at the U.S. Customs gate when departing the country. Kent accompanied Green to the airport and watched him check the suitcase in at an airlines counter. Green did not declare the money even though Faul had instructed him to do so. After Kent and Green waited in the passengers' lounge for some time, they went through an adjoining jetway to board the aircraft. At this point a customs agent approached the two men and arrested Green.

On November 21, 1985, Fisher, Faul, Herron, Steph and Green were indicted for various violations of federal law. Through a superseding indictment, charges were brought only against Fisher, Faul and Herron, and dropped as to Steph and Green, both of whom were called to testify as government witnesses. Count 1 charged Fisher, Faul and Herron with conspiring to defraud the government by impeding and defeating Treasury Department efforts to collect CTRs. Count 3 charged Herron and Counts 2–5 charged Faul with wire fraud. Count 6 charged Fisher with misprision of a felony and Faul with aiding and abetting him.

Following a jury trial, Fisher was acquitted of all charges. Herron was acquitted of the conspiracy charge but was convicted of wire fraud. Faul was found guilty on Counts 1, 3, 4, 5 and 6, but was found not guilty on Count 2. Faul's subsequent motion for a judgment of acquittal was granted as to Count 6 but denied as to the remaining counts. Faul and Herron filed a timely appeal.

## DISCUSSION

Our primary concern here is whether the indictment alleges a cognizable violation of the wire fraud statute. We also examine Faul's conviction for conspiracy to defraud the United States.

### The Scheme to Defraud

█ The government's theory of wire fraud at trial was that Faul and Herron schemed to defraud the Treasury Department and IRS out of information contained on the CTR forms. A wire fraud offense under section 1343 requires proof of two

3. The letter signed by IRS agent "Thomas Kent" read:

> Messers Nathan Shay and Tom Kent Post Office Box 23402 Dallas, Texas 75225
> Re: Financial consulting.
> "Gentlemen:
> This letter when accepted by you will evidence our agreement of this date with reference to matters herein set out.
> You have asked us to advise you and introduce you to persons and firms that would accept large amounts of cash from you outside of the Federal Reserve system and to credit your accounts in Texas with such funds.
> You have assured us the funds are in fact lawfully earned by you in your bean sprout business and you have also assured us that you are not involving us in any illegal activities, and that we are not assisting in any activity that may in any way be interpreted by any federal or other law enforcement agency as being unlawful.
> You have also assured us that you are in goodstanding with the I.R.S. and that we are not assisting you in avoiding or evading of taxes in any way.
> We have undertaken to assist you in arranging for the cash to be deposited in an account for you in Europe and immediately thereafter to be transferred to an account in the United States which we shall help you establish in order for you to purchase C.D.'s for one year.
> We have also asked you to pay us $10,000 in order to meet the expenses of the traveling parties, including yourself, and it's our understanding that the remaining funds would be credited to our fees which will be 1 percent of the amounts placed in banks and you have agreed to pay. If the foregoing sets out your understanding of our agreement please indicate your acceptance in the space below.
> Yours very truly,
> Trans Mercantile Corporation Hannes Faul
> /s/ Thomas Kent

However, testimony at trial brought out the fact that Kent and Shay never made these assurances to Faul. The letter was a sham designed to allay the fears of Green and Steph and procure their cooperation in the laundering scheme.

essential elements: (1) a scheme to defraud; (2) use of, or causing the use of, wire communications in furtherance of the scheme. *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954); *United States v. Gordon*, 780 F.2d 1165, 1171 (5th Cir.1986); *United States v. Cowart*, 595 F.2d 1023, 1031 n. 10 (5th Cir.1979). While the language of 18 U.S.C. § 1343[4] proscribes "any scheme or artifice to defraud," this is not to suggest that the wire fraud statute is limitless. This Court explained in *United States v. Bruno*, 809 F.2d 1097 (5th Cir.1987), that a scheme by public officials to defraud local government effectively impairs "the public's right to the honest and faithful services of its officials [though it] reaches the outer limits of meaning that can be placed on the word 'defraud.'" *Id.* at 1105 n. 1. This statement proved prophetic.

In *McNally v. United States*, ––– U.S. –––, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the Supreme Court examined the "any scheme or artifice to defraud" language contained in 18 U.S.C. § 1341, the mail fraud statute.[5] As in *Bruno*, the public officials in *McNally* were convicted for participation in a scheme that "defrauded the citizens and government of Kentucky of certain 'intangible rights,' such as the right to have the Commonwealth's affairs conducted honestly." *McNally*, ––– U.S. at –––, 107 S.Ct. at 2877. The Court held that "[t]he mail fraud statute clearly protects property rights," ––– U.S. at –––, 107 S.Ct. at 2879, but does not encompass "intangible rights" because the term "defraud" literally means "wronging one in his *property* rights by dishonest methods or schemes." ––– U.S. at –––, 107 S.Ct. at 2881, (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512,

68 L.Ed. 968 (1924) (emphasis added)). Since the jury "was not required to find that the Commonwealth itself was defrauded of any money or property," *Id.*, the Court reversed McNally's conviction. "Rather than construe the statute in a manner that leaves its outer boundaries ambiguous ... we read section 1341 as limited in scope to the protection of property rights. If Congress desires to go further, it must speak more clearly than it has." *McNally*, ––– U.S. at –––, 107 S.Ct. at 2881.

Before *McNally*, numerous cases construing the mail fraud and wire fraud statutes recognized two distinct types of fraud. One category included schemes which intend the deprivation of tangible economic interests, i.e., money or property. *United States v. Hammond*, 598 F.2d 1008 (5th Cir.1979); *United States v. Becker*, 569 F.2d 951 (5th Cir.1978); *United States v. Lindsey*, 736 F.2d 433, 436 (7th Cir.1984). The other category concerned schemes to deprive an individual or entity of intangible rights or interests, otherwise known as "fiduciary fraud" or "intangible rights fraud." *Bruno*, 809 F.2d at 1104–06 (public officials' fiduciary duty to citizens); *United States v. Alexander*, 741 F.2d 962, 964 (7th Cir.1984); *U.S. v. Margiotta*, 688 F.2d 108, 121 (2d Cir.1982), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983). Strictly speaking, "intangible rights fraud" required a fiduciary relationship between the "schemer" and the party or entity defrauded; without a fiduciary obligation, there was no fraud in depriving another of an intangible benefit. After *McNally*, the "intangible rights" line of cases are of dubious precedential value un-

---

**4.** Title 18, U.S.C. § 1343 provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more

than $1,000 or imprisoned not more than five (5) years, or both.

**5.** The wire fraud statute and mail fraud statute employ the same "scheme or artifice to defraud" language, and the construction of either statute informs the application of the other. *See, e.g., Bruno*, 809 F.2d at 1104–05; *United States v. Lemire*, 720 F.2d 1327, 1334–35 n. 6 (D.C.Cir.1983); *United States v. Giovengo*, 637 F.2d 941, 944 (3rd Cir.1980), *cert. denied*, 450 U.S. 1032, 101 S.Ct. 1743, 68 L.Ed.2d 228 (1981).

less there was a direct deprivation of money or property.[6]

This Court has previously recognized that an individual's ability to devise a scheme to deceive or defraud is virtually unlimited—"as old as falsehood and as versable as human ingenuity." *Weiss v. United States*, 122 F.2d 675, 681 (5th Cir.), *cert. denied*, 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550 (1941). One recent phenomenon of fraudulent activity is the veritable explosion of persons engaged in money laundering, which occurs when large sums of money are deposited in or withdrawn from the banking system through a means whereby the illicit origin of the funds is not discoverable by the government. The rapid growth of money laundering used to conceal the ill-gotten gains of organized crime literally outpaced the ability of the federal government to prosecute those responsible under existing criminal statutes.[7]

In its desire to combat the pernicious problem of money laundering, Congress enacted the Money Laundering Control Act of 1986[8] and created a substantive money laundering offense. After a series of hearings on the extent of money laundering and law enforcement problems in stemming its growth, the U.S. Congress concluded that:

> criminals involved in [profitable illegal] enterprises have devised complex schemes to disguise the illegal nature and true source of their income. Participants in such schemes span the spectrum from individuals to legitimate businesses to organized crime. The schemes themselves have grown in magnitude and intricacy in recent years, outstripping the ability of federal law enforcement officers to keep pace with effective prosecution under existing laws.... 'Ultimately, the degree of sophistication and complexity in a laundering scheme is virtually infinite, and is limited only by the creative imagination and expertise of the criminal entrepreneurs who devise such schemes.'

S.Rep. No. 99–433, 99th Cong., 2d Sess. 2 (1986) (quoting "The Cash Connection: Organized Crime, Financial Institutions, and Money Laundering"; Report, Presidential Commission on Organized Crime at 8 (October, 1984)). Thus, the new statute specifi-

---

6. Several Circuit Courts of Appeal previously affirmed convictions under an expansive reading of the wire fraud statute. "The wire fraud statute under which defendants were convicted, 18 U.S.C. § 1343, condemns *all* schemes to defraud in which interstate wires are used to further the scheme." *United States v. Frick*, 588 F.2d 531, 534 (5th Cir.1979) (citations omitted) (emphasis added). *See also United States v. Condolon*, 600 F.2d 7, 8 (4th Cir.1979) ("fraudulent scheme need not be designed to obtain money or property, nor need it involve the breach of fiduciary relationships"); *United States v. Patterson*, 528 F.2d 1037, 1041 (5th Cir.1976) ("no necessity for the government to prove actual financial loss" to establish wire fraud offense once *intent* to defraud was shown); *United States v. Curry*, 681 F.2d 406 (5th Cir.1982) (mail fraud conviction); *United States v. Louderman*, 576 F.2d 1383, 1387–88 (9th Cir.1978); *United States v. States*, 488 F.2d 761, 765 (8th Cir.1973). We mention these cases only to emphasize that their language must now be understood as limited by *McNally*. In addition, the holding in *Bruno* that public officials violate the wire fraud statute when they deprive citizens of the "intangible right to good government" is no longer controlling.

7. Several cases have held that where a person is making a deposit or withdrawal subject to a CTR filing by a financial institution and at-

tempts to structure the transaction so as to evade the reporting requirement, this scheme constitutes a crime. However, due to the various means used by persons who launder money, a number of different criminal statutes have been utilized. *See, e.g., United States v. Cure*, 804 F.2d 625 (11th Cir.1986) (violation of 18 U.S.C. § 371, 31 U.S.C. § 5313); *United States v. Thompson*, 603 F.2d 1200 (5th Cir.1979) (violation of 31 U.S.C. §§ 1059, 1081); *United States v. Cook*, 745 F.2d 1311 (10th Cir.1984); *United States v. Puerto*, 730 F.2d 627 (11th Cir.1984); *United States v. Tobon-Builes*, 706 F.2d 1092, 1099 (11th Cir.1983) (violation of 18 U.S.C. § 1001 committed when defendant "caused financial institutions not to report currency transactions that they had a duty to report and would have reported if they had known about" the scheme). Yet a number of cases have held that structuring a series of "multiple transactions," each of which is less than the $10,000 reporting threshold per bank per day, does *not* violate the law because an individual is not required to file a CTR. *See, e.g., United States v. Denemark*, 779 F.2d 1559 (11th Cir.1986); *United States v. Anzalone*, 766 F.2d 676 (1st Cir.1985); *United States v. Reinis*, 794 F.2d 506 (9th Cir.1986).

8. Subtitle H of Title I of the Anti-Drug Abuse Act of 1986, Public Law 99–570, signed by the President on October 27, 1986. *See* Title 18, U.S.C. § 1956, 1987; 31 U.S.C. § 5324.

cally criminalized money laundering and the various surreptitious means of structuring financial transactions used to avoid detection by the IRS, which gives the United States a specific weapon to use in prosecuting those who launder money. However, this statute was not available when Faul and Herron were indicted for wire fraud, and the *McNally* decision restricts the application of the federal anti-fraud statutes to newly-created means of fraud: there must be a direct deprivation of money or property resulting from the fraudulent scheme to establish a prosecutable offense.

Only two previous cases, *United States v. Richter*, 610 F.Supp. 480 (N.D.Ill.1985), aff'd sub nom on other grounds, *United States v. Mangovski*, 785 F.2d 312 (7th Cir.), cert. denied, —— U.S. ——, 107 S.Ct. 191, 93 L.Ed.2d 124 (1986), and *United States v. Gimbel*, 632 F.Supp. 748 (E.D. Wis.1985), appeal pending, No. 86–1808 (7th Cir.1986), have considered whether a money laundering scheme designed to prevent the filing of CTRs defrauds the government in a manner prosecutable under the wire fraud statute. These two cases examining alleged wire fraud violations in the context of laundering schemes designed to avoid triggering CTR reports have differed on one crucial issue: the category of fraud in which the avoidance of CTR requirements properly falls. *Richter* held that CTRs were designed to provide the Treasury Department with *information,* which it specifically termed an "intangible" benefit. 610 F.Supp. at 494 n. 22. Since there was no fiduciary obligation on the part of a private individual to provide CTR information to the government, the *Richter* court dismissed the wire fraud indictments. 610 F.Supp. at 495. However,

the district court in *Gimbel* viewed the scheme to avoid the filing of CTRs by financial institutions as a plan designed to deprive the government of information *and taxes.* "The ultimate aim of a money laundering scheme ... is to deprive the government of taxes." 632 F.Supp. at 759. The language of the indictment in *Gimbel* explicitly alleged the deprivation of income taxes. Since the collection of taxes is a tangible economic concern of the United States, it was unnecessary to establish a fiduciary relationship between the defendant and the government. The *Gimbel* court refused to dismiss the indictments for wire fraud.

 The entire purpose of the CTR filing is to leave a "paper trail" so the IRS will be able to ascertain if taxes have been paid on large sums of money which move in interstate commerce, whether legally or illegally.[9] The record does reflect that Faul and Herron intended to facilitate the deposit of $500,000 in a domestic bank without a CTR filing, a surreptitious goal in violation of federal reporting requirements. 31 U.S.C. § 5313; 31 C.F.R. § 103.22. This clandestine plan was in violation of the law, but it was a law that required only information and imposed no penalties.[10] The word "taxes" does not appear in the indictment, and no tangible or economic advantage to the participants or detriment to the United States (or any private individual) is alleged. Certainly a scheme to defraud the United States of taxes would meet the "money or property" requirement of *McNally*, but that is not the case before us today. The narrow question presented here, actually made academic by the new law, is whether a wire fraud violation exists when persons conspire and scheme to launder money and

---

9. Congress described the purpose of the Bank Secrecy Act of 1970, which authorized the Secretary of the Treasury to promulgate appropriate regulations to effectuate Congress' intent, as a mandate "to require certain reports or records where they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings." 31 U.S.C. § 5311. *See generally,* H.R.Rep. No. 91–975, 91st Cong. 2d Sess. 11 (1970), U.S.Code Cong. & Admin.News 1970, pp. 4394–4408; *California Bankers Assn. v. Shultz,* 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974)

(Bank Secrecy Act enacted in response to Congressional concern about widespread use of foreign financial institutions to evade domestic law).

10. Civil and criminal penalties for persons who cause or attempt to cause a domestic financial institution to fail to file required reports were not established until passage of the Money Laundering Control Act of 1986. *See* 18 U.S.C. §§ 1956, 1957; 31 U.S.C. § 5324.

use interstate wire communications to achieve that goal. While the motivating force behind the defendants' actions was an intent to introduce large sums of money into the domestic banking system without triggering a financial institution's reporting requirement, we believe the deprivation of CTR information from financial institutions fails to satisfy the "money or property" requirement of *McNally*. Faul and Herron were clearly aware of the CTR reporting requirements, but neither defendant could reasonably expect that his conduct constituted wire fraud. In fact, Congress enacted the new money laundering statute partially because courts were "reluctant to interpret the [CTR] reporting requirements of the Bank Secrecy Act to apply to customers as well as to financial institutions." S.Rep. 99–433, 99th Cong., 2d Sess. 3 (1986). Of course, it is axiomatic that criminal statutes are to be strictly construed. *Kline v. Burke Construction Co.*, 260 U.S. 226, 43 S.Ct. 79, 67 L.Ed. 226 (1922). We thus feel bound to conclude that neither Faul nor Herron were aware that the avoidance of reporting requirements, without more, could be a wire fraud offense. *See United States v. Powell*, 423 U.S. 87, 96 S.Ct. 316, 46 L.Ed.2d 228 (1975).

The United States urges us to bring the present appeal within *McNally*'s approval of language in *Durland v. United States*, 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709 (1896), which suggested the phrase "'any scheme or artifice to defraud' ... be interpreted broadly insofar as property rights are concerned." *McNally*, —— U.S. at ——, 107 S.Ct. at 2879–80. The government relies in part on this Court's decision in *United States v. Fagan*, 821 F.2d 1002 (5th Cir.1987), where we affirmed mail fraud convictions by holding that an employee's acceptance of secret kickback payments constituted "economically material

information" to the company unaware of the scheme. Though *Fagan* was argued and substantially written before *McNally* was issued by the Supreme Court, the *Fagan* panel explained that its opinion was consistent with *McNally*. The employee involved in the kickback scheme "had a fiduciary duty to disclose" his acceptance of bribes to his employer. 821 F.2d at 1011. Moreover, the company clearly had a property right in "control over its [own] money" and the "economic value" of conducting business without supporting the kickback payments. *Id.* at n. 6. This serves to distinguish *Fagan* from the instant case. Here, as we have previously discussed, Faul and Herron owed no fiduciary duty to the IRS or financial institution to make bank deposits in a specified manner under any existing statute—the duty was on banks, not individuals, to file CTRs on cash transactions over $10,000. Furthermore, the government had no right of ownership in CTR information potentially generated by Faul and Herron commensurate with a company's property interest in its own money.

The government also argues that the theft of information in any form has supported numerous convictions for theft of government property pursuant to 18 U.S.C. § 641.[11] However, in each case brought to our attention the government already had possession of the information which was stolen. The government had no proprietary interest in the CTR information it failed to obtain from Faul and Herron. *Cf. Andrus v. Allard*, 444 U.S. 51, 64–66, 100 S.Ct. 318, 326–27, 62 L.Ed.2d 210 (1979) (describing "full 'bundle' of property rights" which inhere in ownership of property). Though the dicta in *McNally* supports a broad construction of property rights, the holding requires this Court to ascertain that the "scheme or artifice to

---

**11.** Section 641 prohibits the theft, embezzlement or conversion of any "thing of value" of the United States. *See, e.g., United States v. Croft,* 750 F.2d 1354, 1361–62 (7th Cir.1984) (theft of the services of a student undertaking research pursuant to a government grant is a § 641 theft); *United States v. Girard,* 601 F.2d 69, 71 (2nd Cir.) (theft of DEA information from a computer disk) *cert. denied,* 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979); *United States v. Friedman,* 445 F.2d 1076, 1087 (9th Cir.) (theft of grand jury transcripts and information contained therein was theft of government property), *cert. denied,* 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971); *United States v. Morison,* 604 F.Supp. 655, 663–65 (D.Md.1985) (theft of classified information).

defraud" underlying a wire fraud conviction does involve money or property. We refuse to create a new strand in the bundle of property rights which gives the government an ownership interest in information it does not already possess and has not by law compelled an individual to divulge.

It is also important to note that the jury instructions in this case did not require the jury to find that the United States had been defrauded of money or property by the defendants.[12] In *McNally* the Supreme Court explained that "[a]lthough the government now relies in part on the assertion that the petitioners obtained [money or] property by means of false representations ... there was nothing in the jury charge that required such a finding. We hold, therefore, that the jury instruction on the substantive mail fraud count permitted a conviction for conduct not within the reach of section 1341." *McNally*, ── U.S. at ──, 107 S.Ct. at 2882. Since the section 1343 wire fraud convictions here did not require a jury finding that Faul and Herron defrauded the United States out of money or property, their convictions for wire fraud must be reversed.

*The Conspiracy to Defraud*

The term "defraud" also appears in section 371.[13] However, the meaning of the term "defraud" as used in section 371 is broader than the "defraud" which appears in sections 1341 and 1343 due to the different legislative considerations behind passage of each statute. *McNally*, 55 U.S. L.W. 5011, 5014 n. 8; *Bridges v. United States*, 346 U.S. 209, 220–21, 73 S.Ct. 1055, 1061–62, 97 L.Ed. 1557 (1953); *United States v. Cohn*, 270 U.S. 339, 346–47, 46 S.Ct. 251, 253, 70 L.Ed. 616 (1926); *see generally United States v. Curry*, 681 F.2d 406, 422–25 (5th Cir.1982) (Garwood, J., concurring). Section 371 encompasses any "deceitful interference with governmental functions" because the "emphasis is on protection of the United States from 'any offense' against it, and 'offense' in this connection has been construed to include many civil as well as criminal wrongs." *Id.* at 423 (citations omitted). *Accord, Tanner v. United States*, ── U.S. ──, ──, 107 S.Ct. 2739, 2751–52, 97 L.Ed.2d 121 (1987) (section 371 reaches any conspiracy to impair, obstruct, or defeat the lawful function of any department of government).

The section 371 indictment charged a conspiracy including the following:

"It was a part of this conspiracy that defendants devised a scheme to deposit substantial sums of money, ostensibly belonging to the informant and Agent Kent, into a bank in Dallas, Texas in such a way that the bank would not be required to file a Currency Transaction Report (IRS Form 4789) with respect to such a deposit.

"It was further a part of this conspiracy that defendants devised a scheme to secretly transport $500,000.00 in cash

---

**12.** After reading section 1343, the district court charged the jury:

In order to establish a violation of this statute, the Government must prove beyond a reasonable doubt:

First, that the Defendant in question knowingly and wilfully devised, or intended to devise, a scheme to defraud, as alleged in the Indictment;

Second, the Defendant in question knowingly and wilfully transmitted, or caused to be transmitted, by means of wire in interstate or foreign commerce, writings, signs, signals, or sounds, for the purpose of executing the scheme to defraud.

Your instructions: The term scheme includes any plan or course of action intended to deceive others.

A transmission by means of wire includes the use of interstate or international communications, such as a telephone, telex or wire.

To act with intent to defraud means to act knowingly and with the specific intent to deceive.

To cause a wire transmission is to do an act with knowledge that a wire transmission will follow in the ordinary course of business or where such transaction can reasonably be foreseen. Each separate transmission constitutes a separate offense.

**13.** The statute reads in pertinent part:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

outside the United States for the use of Agent Kent without filing a Report of International Transportation of Currency or Monetary Instruments (Customs Form 4790) with the Customs Service as required by law."

The two above-referenced reports—a Currency Transaction Report, Internal Revenue Service Form 4789, and a Report of International Transportation of Currency or Monetary Instruments, Customs Form 4790, respecting the $500,000 in cash to be taken out of the United States—are the only official reports with which the section 371 conspiracy count of the indictment concerns itself.

 The failure to declare money at our national border by not filing the Customs Form 4790 report required by 31 C.F.R. § 103.23(a) is a criminal offense and a civil wrong. 31 U.S.C. §§ 5312(a)(3)(A), 5316, 5321, 5322. *See, e.g., United States v. Hernando Ospina,* 798 F.2d 1570 (11th Cir.1986); *United States v. Palzer,* 745 F.2d 1350 (11th Cir.1984). A conspiracy to do this is a violation of 18 U.S.C. § 371. Faul takes exception to the sufficiency of the evidence by which he was convicted of conspiracy. Faul claims that he is exonerated by reason of his last-minute instruction to Green to file the customs report, an instruction which Green disregarded.[14] But this instruction came after the conspiracy had been entered into and after virtually all the alleged overt acts had taken place. Under this record, the jury was entitled to find either that the instruction was feigned and not intended to be followed[15] or that it represented at most a change of heart after the conspiracy offense had been committed. It is, of course, well settled that the objects of a conspiracy need not be achieved in order for the offense to have been committed. Withdraw-

al after entering into the agreement and the commission of one or more overt acts pursuant thereto does not prevent a conspiracy conviction of the withdrawing party. *See United States v. Jimenez,* 622 F.2d 753 (5th Cir.1980); 2 La Fave & Scott, *Substantive Criminal Law* § 6.5 at 110–11 (1986).

The fact that the indictment alleged a failure to file both CTR form 4789 (the basis for the wire fraud convictions) and Customs Form 4790 does not mean Faul's conviction for conspiracy is infirm. "[I]t is not necessary for the government to prove all of the allegations in an indictment count; it need prove only enough allegations to establish violation of the statute on which the count relies." *United States v. Bruno,* 809 F.2d 1097, 1104 (5th Cir.1987); *see United States v. Georgalis,* 631 F.2d 1199, 1205 (5th Cir.1980). The indictment sufficiently set forth the elements necessary to convict Faul for conspiracy to defraud the United States. "The test for validity is not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards." *United States v. Gordon,* 780 F.2d 1165, 1169 (5th Cir.1986) (citing *United States v. Webb,* 747 F.2d 278, 284 (5th Cir.1984), *cert. denied,* 469 U.S. 1226, 105 S.Ct. 1222, 84 L.Ed.2d 362 (1985)). Accordingly, Faul's appeal on the conspiracy conviction must be rejected. The evidence is sufficient to show a conspiracy to take the cash out of the United States without filing the required Customs Form 4790, thus resolving adversely to Faul his sole complaint respecting his section 371 conviction.

### CONCLUSION

We therefore REVERSE the wire fraud convictions entered against defendants

---

**14.** Counsel indicated at oral argument that Green was a government agent. The record does not bear this out. In fact, Green was originally indicted by the government, and he filed a Motion to Dismiss the indictment due to Outrageous Government Conduct. The charges against Green were dropped after he agreed to testify. At most, Green was an after-the-fact informant and a government witness; he was not a government agent who purposefully failed

to declare the money at Customs. Furthermore, Faul did not raise the question of entrapment on appeal. Our close examination of the record and the court's proper jury instruction on entrapment show that the issue of entrapment was presented to and rejected by the jury; we find no entrapment as a matter of law.

**15.** See note 3 and accompanying text.

**60**

Herron and Faul and AFFIRM Faul's conviction for conspiracy to defraud the United States government. The court below shall enter a verdict of not guilty for Herron; a verdict of not guilty against Faul on the wire fraud counts; but the court shall retain the verdict of guilty on the conspiracy count as to Faul.

REVERSED in part, AFFIRMED in part.