**UNITED STATES of America**

**v.**

**Bobby R. LITTLE and North Mississippi Supply Company, Inc.**

**Crim. A. No. CRE 87–105–D.**

United States District Court,
N.D. Mississippi.

April 25, 1988.

Robert Q. Whitwell, U.S. Atty., John R. Hailman, Asst. U.S. Atty., Oxford, Miss., for plaintiff.

Orma R. Smith, Jr., Corinth, Miss., J.P. Coleman, Ackerman, Miss., for defendants.

## MEMORANDUM OPINION

DAVIDSON, District Judge.

This cause is presently before the court on the defendants' motion to dismiss the voluminous 310–count indictment in this case. Having reviewed the parties' memoranda and supporting authorities, the court finds that the motion should be denied.

## I.

## BACKGROUND

This case involves yet another in the series of indictments arising from the Federal Bureau of Investigations' recent undercover operation in Mississippi, known as OPERATION PRETENSE. The numerous recent indictments and convictions have been well documented in the local media and will not be recounted by the court. This case, however, has an interesting "twist" when compared to its several past and concurrent counterparts: the defendants in this case are a private citizen, Bobby R. Little ("Little"), and the corporation of which Little is president and chief executive officer, North Mississippi Supply Company, Inc. ("NMSC"). The 310–count indictment against Little and NMSC alleges illegal activity over a protracted period of time from approximately 1982 through 1987. The charges made out in the indictment relate to alleged violations of the federal mail fraud statute, 18 U.S.C. § 1341, the federal conspiracy statute, 18 U.S.C. § 371, and the relatively new federal gratuity or bribery statute, 18 U.S.C. § 666.

The defendants attack each and every one of the 310 counts of the indictment, contending either that the counts do not allege acts which violate the federal statute involved or challenging the validity of the statute under which the charge is made.

The court addresses individually the principal charges of the indictment.

## II.

### SECTION 1341 CHARGES

A. Appliction of *McNally* and Its Progeny

■ The defendants' challenge to the mail fraud counts (Counts 1–298) in the indictment are tied primarily to the Supreme Court's decision last term in the case of *McNally v. United States,* 483 U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). The court's decision in *McNally* has been interpreted by some as severely limiting the application of Section 1341. The question the court addresses here is whether *McNally* may be read as prohibiting application of Section 1341 to the acts charged against the defendants in this cause.

The relevant portions of Section 1341 read as follows:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing ... shall be fined not more than $1,000 or imprisoned not more than five years, or both.

Prior to the Supreme Court's decision in *McNally,* the mail fraud statute had been interpreted broadly by the courts to include even schemes to defraud the citizenry of their intangible right to an honest government. *McNally, supra,* 483 U.S. at ——, 107 S.Ct. at 2880, 97 L.Ed.2d at 301 (citing *United States v. Clapps,* 732 F.2d 1148 (3rd Cir.1984) and *United States v. States,* 488 F.2d 761 (8th Cir.1973), *cert. denied,* 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974)). The Fifth Circuit clearly explained the situation which existed prior to *McNally* in the recent case of *United States v. Herron,* 825 F.2d 50 (5th Cir.1987):

Before *McNally,* numerous cases construing the mail fraud and wire fraud statutes recognized two distinct types of fraud. One category included schemes which intend the deprivation of tangible economic interests, i.e., money or property. [citations omitted] The other category concerned schemes to deprive an individual or entity of intangible rights or interests, otherwise known as "fiduciary fraud" or "intangible rights fraud." [citations omitted] Strictly speaking, "intangible rights fraud" required a fiduciary relationship between the "schemer" and the party or entity defrauded; without a fiduciary obligation, there was no fraud in depriving another of an intangible benefit.

*Id.* at 54.

In *McNally,* the Supreme Court took a closer look at the "scheme or artifice to defraud" language of Section 1341, holding that Section 1341 is "limited in scope to the protection of property rights." *Id.* at ——, 107 S.Ct. at 2881, 97 L.Ed.2d at 302. This ruling effectively did away with the previous line of cases permitting a Section 1341 conviction for violation of such "intangible" rights as the right to an honest government. *See United States v. Runnels,* 833 F.2d 1183, 1186 (6th Cir.1987); *United States v. Herron,* 825 F.2d 50, 55 n. 6 (5th Cir.1987).

Although some might have thought that *McNally* represented a significant limitation on the scope of indictable offenses under Section 1341, the court clarified the ambit of *McNally* in a decision handed down this term. Justice White, who wrote for a seven-member majority court in *McNally,* also delivered the unanimous opinion of the eight-justice court in *Carpenter v. United States,* 484 U.S. ——, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), in which the court clearly stated that "McNally did not limit the scope of Section 1341 to tangible as distinguished from intangible property rights." *Id.* at ——, 108 S.Ct. at 320, 98 L.Ed.2d at 283.

In *Carpenter,* the court considered the fraudulent use of confidential information by a columnist of the *Wall Street Journal.*

The court concluded: "The Journal's business information that it intended to be kept confidential was its property...." *Id.* at ——, 108 S.Ct. at 321, 322, 98 L.Ed.2d at 285.

In the present case, the defendants argue that they are protected from liability by the ruling in *McNally,* inasmuch as defendants urge that they did not defraud the counties cited in the indictment of any tangible or intangible property interests. As the defendants state their position, Pontotoc County and Monroe County received everything for which they paid, including the substantial amounts of culvert pipe, bridge timbers, and grader blades set forth in the indictment. Since the counties were deprived of neither tangible nor intangible property, defendants assert, there can be no Section 1341 conviction against them.

The government counters defendants' argument by stating that the defendants paid many thousands of dollars in cash, in secret, on a continuing and regular basis, to seven different county supervisors from Pontotoc County and Monroe County, Mississippi. Over a period of several years, in one instance stretching from 1982 through 1987, the government alleges, defendants paid kickbacks to these supervisors of approximately five percent (5%) on almost every culvert pipe, grader blade, or bridge timber contract awarded to NMSC.[1] Had it not been for this kickback scheme, the government argues, the counties might have obtained culvert pipe, bridge timber, and grader blades at a lower cost and would have obtained the cash the defendants paid to the supervisors. Thus, the government concludes, the counties were in fact deprived of tangible property as required under the *McNally* case.

The defendants' argument that the money they used to pay the alleged kickbacks to supervisors was "their own money" begs the question before this court. The alternative argument could easily be made, as it is by the government, that the money

in question was not Little's or NMSC's until such time as the counties paid the money over to them. After the money was paid over by the counties, Little, acting on behalf of NMSC, paid the alleged illegal gratuities to the county supervisors. Of course, Little and NMSC make the well-reasoned argument that the monies paid over were their *personal* funds, not the funds paid to them by the respective counties. The court is of the opinion that this contention may be better evaluated once the court has heard the relevant proof as to the origin of the monies paid over by Little to the county supervisors. On this motion to dismiss, the court could do little more than render an advisory opinion indicating which party has made the better argument on this issue. Such conjecture is to be avoided in favor of complete development of the facts at trial.

Even if defendants are able to prove at trial that they paid the alleged kickbacks out of their personal funds, the court is of the opinion that the Section 1341 counts of the indictment would not necessarily fail based on that fact alone. In addition to the cash allegedly paid over by the defendants in this case, the government suggests that the scheme involved here also deprived the counties involved of another actual, albeit intangible, property interest: namely, the information that the supervisors were being paid to award contracts to the defendants. *Cf. United States v. Fagan,* 821 F.2d 1002 (5th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 697, 98 L.Ed.2d 649 (1988); *Ingber v. Enzor,* 664 F.Supp. 814 (S.D.N.Y.1987), *aff'd,* 841 F.2d 450 (2nd Cir.1988).

In *Fagan,* the first post-*McNally* ruling of the Fifth Circuit on Section 1341, the Court of Appeals held that information related to a kickback scheme between an employee, Riley, and Fagan, operator of a boat leasing company utilized by Riley's employer, Texoma Production Company, had some economic value to Texoma and supported Fagan's conviction under Section

---

1. As discussed more fully *infra,* the repetitive and lengthy nature of these payments in addition to the fact that each payment was almost exactly 5% of the invoice amount, militate

against the defendants' argument that these payments form no series of transactions as contemplated by Section 666.

1341. *Id.* at 1008–1009. As the Fifth Circuit noted:

> We believe that there is sufficient evidence that the scheme here was one to deprive Texoma of its property rights, *viz:* its control over its money, as it parted with its rental payments on the basis of a false premise; the economic value of possibly being able to rent the boats from Fagan for less, had it known he was willing to accept less; its right to the kickbacks its employee Riley received from Fagan.

*Id.* at 1010–1011 n. 6. Likewise, in the case *sub judice*, the government asserts that Pontotoc County and Monroe County parted with monies based on a false premise, namely that their supervisors had objectively and properly evaluated each bidder submitting bids for culvert pipe, bridge timbers, and grader blades. The falsity of this premise is made clear by the fact that each of the five Pontotoc County supervisors allegedly received gratuities from defendants on a continuing basis during the time period set forth in the indictment.

Even though the defendants' bids were within permissible State contracting guidelines, there has been no showing that the counties might not have obtained needed supplies at lower cost elsewhere. This court is not prepared to dismiss this case without first hearing the proof in support of the government's allegations at the trial of this matter. Fed.R.Crim.P. 12(e).

### B. Vagueness or Uncertainty of Section 1341 Charges

■ Defendants also argue that their Section 1341 charges are based on fiduciary or statutory duties which are too vague, ambiguous, and overboard to serve as a basis for criminal liability under Section 1341. In this connection, the defendants make reference to the government's allegation that the scheme involved herein also violated Miss. Code Ann., § 31–7–23 (Cum.Supp.1987), which reads in relevant part:

> Any rebates, refunds, coupons, merit points, gratuities, or any article of value tendered or received by any agency or governing authority from any vendor of material, supplies, equipment or other articles shall inure to the benefit of the agency or governing authority making the purchase....

The crux of defendants' argument on this point is that, assuming Section 31–7–23 has any application to the mail fraud charges involved herein, the duty to turn over the alleged gratuities rested on the supervisors, not defendants. Furthermore, defendants argue, even if the supervisors themselves had some duty to turn over any monies received from defendants, that duty was too vaguely defined to support a finding of fraud under Section 1341.

The defendants would have this court find that the fiduciary duty, if any, be established on a case-by-case basis but that no criminal liability be imposed upon these defendants. Interestingly, there is authority which suggests that the existence of a fiduciary relationship is a question of fact for the jury. *See Phillips v. Chevron U.S.A., Inc.*, 792 F.2d 521, 524 (5th Cir. 1986). If the question of defendants' fiduciary duty is one for the jury, then the court should not rule on that question summarily.

As the government notes, however, there was nothing vague or indefinite about the duties of county supervisors under Section 31–7–23. The mere fact that no previous cases have been brought under Section 31–7–23 does not shield the defendants from application of this statute, which was enacted in 1980 and became effective on January 1, 1981. The alleged secretive nature by which defendants conducted their transactions with the supervisors of the counties also suggests that defendants were not in fact ignorant of this statute but rather may have sought to avoid the application thereof. The court also has some difficulty construing the defendants' repeated acts of paying approximately 5% on each contract awarded as a "political contribution" or "gift" to the supervisor. It is curious at best that these "gifts" were almost invariably in the same percentage (5%).

This issue of a duty under Section 31–7–23 is another issue which the court would

prefer to have more fully developed at trial. The court is not prepared at this juncture to rule that the government could not make out a case against these defendants based on the Section 1341 mail fraud charges set out in the indictment. As regards the government's reference to Section 31–7–23, the court notes that a violation of local law is not an essential element of a scheme to defraud under Section 1341. *United States v. States, supra,* at 767.

After *McNally* and *Carpenter,* the relevant inquiry is whether the scheme to defraud charged under Section 1341 deprived the governmental entity, employer or individual involved of some tangible or intangible property interest. The court is not convinced at this juncture that the indictment fails to indicate the deprivation of any property interest on the part of the counties as a result of the alleged kickback scheme.

Defendants also note that the Fifth Circuit has recently reversed a mail fraud conviction in the wake of *McNally.* *See Herron, supra.* This observation is correct. The basis of the Fifth Circuit's reversal in *Herron,* however, was the court's finding that the jury instructions given "did not require the jury to find that the United States had been defrauded of money or property by the defendants." *Id.* 825 F.2d at 58. In another recent instance the Fifth Circuit again reversed a mail fraud conviction, relying on *McNally* and the court's finding that the "indictment and the court's instructions to the jury nowhere require the jury to find that Huls and Miller intended to deprive the State of Louisiana of a property right." *United States v. Huls,* 841 F.2d 109, 111 (5th Cir.1988).[2] It is important to note that the Fifth Circuit indicated in *Huls* that a properly drafted indictment and proper instructions would cure the basis for reversal of the convictions, thus "there is no apparent obstacle

to retrial, should the Government seek a new indictment." *Id.* at 112.

This court, now having the benefit of the Fifth Circuit's guidance from *Herron* and *Huls,* finds that the indictment in this cause is sufficient to satisfy the requirements of *McNally.* The indictment charges that the defendants, in paying kickbacks to the supervisors, sought to defraud the counties of said money and its value. The government will be required to prove its charges at trial. In the event this matter goes to a jury, the government is also advised to draft proposed jury instructions carefully to avoid the problems encountered in *Herron* and *Huls.*

## C. Use of the Mails

■ Defendants' final line of attack against their Section 1341 charges is that since the mails were not used in violating any fiduciary duties, then the mails were not an integral part of the scheme to defraud. The defendants' citiation of *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), appears to defeat their own argument. In *Maze,* the Court stated:

> Under the statute, the mailing must be "for the purpose of executing the scheme, as the statute requires".... but '[i]t is not necessary that the scheme contemplates the use of the mails as an essential element....'
>
> Congress could have drafted the mail fraud statute so as to require only that the mails be in fact used as a result of the fraudulent scheme. But it did not do this; instead, it required that the use of the mails be "for the purpose of executing such scheme or artifice...."

*Id.* at 400, 405, 94 S.Ct. at 648, 651, 38 L.Ed.2d at 608, 611. As the court construes *Maze,* it is not necessary that the mails be the pivotal aspect of the scheme to defraud. Use of the mails must only have a sufficient nexus with the scheme as to

**2.** Even in the recent decision vacating former Maryland Governor Marvin Mandel's mail fraud conviction, *United States v. Mandel,* 672 F.Supp. 864 (D.Md.1987), a case on which defendants rely heavily, the Maryland court based its decision on the jury charge: "The charge given here

did not *require* for conviction that the United States prove that the citizens of Maryland or its public officials suffered any economic loss or injury as a result of petitioners' conduct." *Id.* at 875.

further the scheme or assist it in some way to succeed. *See United States v. Rodgers,* 624 F.2d 1303, 1309–1310 (5th Cir.1980). Here the government alleges that the mailings of NMSC invoices, county checks and other documents all helped the fraudulent scheme to succeed by concealing the cash payoffs.[3] The court is inclined to permit the government the opportunity to prove its assertions at the trial of this matter.

Accordingly, the court must deny defendants' request to dismiss the counts under Section 1341. The defendants are reminded that they may exercise their right under Rule 29(a) of the Federal Rules of Criminal Procedure to move for judgment of acquittal after the government has presented its proof at trial.

### III.

### CONSPIRACY CHARGES

■ The defendants also attack the conspiracy charges set out in Counts 299, 301, 303, 305, 307, 309 and 310 of the indictment. These conspiracy charges, brought pursuant to 18 U.S.C. § 371, are intricately connected with the substantive mail fraud and bribery charges alleged under Sections 1341 and 666, respectively. In relevant portion, the conspiracy counts allege that the defendants "did knowingly, and willfully combine, conspire, confederate and agree [to offer, give or agree to give gratuities] in violation of 18 U.S.C. § 666, and to cause the United States mails to be used in a scheme to defraud [the counties] of money in connection with those transactions in violation of 18 U.S.C. § 1341." The overt acts asserted as supporting the conspiracy charges are the actual payments to the supervisors and actions taken to influence supervisors not to cooperate with the government as witnesses.

The court is of the opinion that all the evidence on these charges should be heard before the court makes a conclusive ruling on the validity of the charges. As permitted by Rule 29(a) of the Federal Rules of Criminal Procedure, defendants may move at trial for a judgment of acquittal if the evidence presented is insufficient to support their conviction.

### IV.

### SECTION 666 CHARGES

**A. Origin and Purpose of Statute**

The defendants next challenge the allegations of Counts 300, 302, 304, 306, and 308, which charge defendants with bribery under 18 U.S.C. § 666. In relevant part, Section 666 provides:

> (a) Whoever, if the circumstances described in subsection (b) of this section exists—
>
> .  .  .  .  .
>
> (2) corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more. . . .
>
> (b) The circumstances referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

Section 666 is a relatively new statute which was enacted as part of the Comprehensive Crime Control Act of 1984. Section 666 did not become effective until October 12, 1984 and has only been authoritatively interpreted by two federal appellate courts.[4] It is the court's under-

---

**3.** As the Fifth Circuit has indicated: "[A] fraudulent scheme may depend on a mailing even after the defrauders have received the sought-after money or documents, because "the use of the mails after the money is obtained [or documents stolen] may be for the purpose of execu-

ting the fraud." (citation omitted) *United States v. Kent,* 608 F.2d 542, 546 (5th Cir.1979).

**4.** The Tenth Circuit Court of Appeals considered the limited question of applicability of the statute to Indian tribes in *United States v. Barquin,*

standing that the defendants' challenge of Section 666 herein is a matter of first impression in this court. Thus, the court writes on a clean slate.

■ In construing any statute, the court must look first to the actual language of the statute and then to the legislative history of the statute to ascertain Congress' purpose in enacting the statute. *See Daily Income Fund, Inc. v. Fox,* 464 U.S. 523, 104 S.Ct. 831, 78 L.Ed.2d 645 (1984); *California v. Sierra Club,* 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981). The legislative history of Section 666 is found at 1984 U.S.Code Cong. and Admin.News 3182, 3510–3511. The relevant language reads as follows:

> This part of title XI is designed to create new offenses to augment the ability of the United States to vindicate significant acts of theft, fraud, and bribery involving Federal monies that are disbursed to private organizations or State and local governments pursuant to a Federal program.
>
> .    .    .    .    .
>
> With respect to bribery 18 U.S.C. 201 generally punishes corrupt payments to Federal public officials, but there is some doubt as to whether under what circumstances persons not employed by the Federal Government may be considered as a "public official" under the definition of 18 U.S.C. 201(a)....
>
> .    .    .    .    .
>
> Part C adds a new section 666 to title 18, United States Code. Subsection (a) makes it a Federal crime for an officer, employee or agent of an organization or of a State or local government agency ... to steal, embezzle, obtain by fraud, willfully misapply or otherwise knowingly convert without authority property valued at $5,000 or more.... [I]t is not the intent of this section to make a theft

of $5,000 or more from the supplier a Federal crime. It is, however, the intent to reach thefts and bribery in situations of the types involved in the *Del Toro, Hinton,* and *Mosley* cases cited herein. *Id.* The problem encountered in *U. S. v. Del Toro,* 513 F.2d 656 (2d Cir), *cert. denied,* 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975), and the other cases cited by Congress in enacting Section 666 was that local or state officials, although they might control large sums of federal monies, could not be brought within the ambit of 18 U.S.C. § 201 because these local and state officials were not federal "public officials." *Del Toro, supra,* at 661–663. It was apparently Congress' intent in enacting Section 666 to expand the reach of federal criminal jurisdiction to officials or other actors connected with state or local agencies which receive more than $10,000 in federal funds in any calendar year, thereby "filling in the gap" left by 18 U.S.C. § 201.[5] As one district court has interpreted Section 666, it was clearly intended to augment existing statutes, such as Section 201, and to do more than simply strengthen existing provisions. *See United States v. Sadlier,* 649 F.Supp. 1560, 1563 (D.Mass.1986).

**B. Defendants' Challenges to Section 666 Charges**

The defendants raise several points in opposition to the charges made against them under Section 666, arguing that the indictment does not state a crime against the United States under Section 666. The court addresses each argument separately below.

**1. No Supervisor Received $5,000 in Bribes or Gratuities After the Effective Date of the Statute**

■ Defendants interpret Section 666 as requiring that the payoffs or kickbacks involved must exceed $5,000, not the series

---

799 F.2d 619 (10th Cir.1986). In *United States v. Westmoreland,* 841 F.2d 572 (5th Cir.1988), the Fifth Circuit upheld the conviction of a Perry County, Mississippi county supervisor based on Section 666. Although *Westmoreland* concerned primarily the issue of origin of funds involved in a Section 666 charge, the Fifth Circuit found no constitutional defects in the statute.

5. The Fifth Circuit's analysis in *Westmoreland, supra,* confirms this court's construction of the purpose of Section 666. As the Fifth Circuit said in *Westmoreland:* "[I]t is clear that Congress has cast a broad net to encompass local officials who may administer federal funds regardless of whether they actually do." *Id.,* at 577.

of invoices or transactions to which the kickbacks relate.[6] The government contends that it is sufficient that the transactions involved exceed $5,000, not the payoffs or kickbacks involved.[7]

Two district courts construing Section 666 have rejected arguments similar to that of the defendants. In *Sadlier, supra,* the Massachusetts District Court held plainly: "the kickback must [only] result from the defendant's conduct in a transaction involving $5,000 or more." *Id.* at 1562. In a decision involving another recent OPERATION PRETENSE case in the Southern District of Mississippi, Judge Barbour ruled:

> It is enough on the face of the statute that federal funds are provided to a county in the amount of $10,000.00 and there is bribery of a supervisor or other local government agent involving a transaction or series of transactions of at least $5,000.00 concerning the affairs of the government or organization.

*United States v. Smith,* 659 F.Supp. 833, 835 (S.D.Miss.1987).

As noted above, the defendants apparently do not contend that either Pontotoc or Monroe County fail to receive the requisite $10,000 in federal funds. What defendants do argue, however, is that none of the alleged single transactions nor the entire series of transactions involved payments of more than $5,000 to a supervisor.

The court finds the defendants' interpretation of Section 666 erroneous. There is nothing on the face of the statute that requires that payments of $5,000 or more be made before the statute is operative. This court agrees with the findings made by the Massachusetts court in *Sadlier, supra,* and by Judge Barbour in *Smith, supra.* In reaching this conclusion, the court recites the pertinent language of Section 666 which mandates this finding: [It shall be a violation of Section 666 if one] corruptly gives, offers, or agrees to give *anything of value* to any person ... *in connection with any business, transaction, or series*

*of transactions* of such organization, government, or agency *involving anything of value of $5,000 or more."* (emphasis added)

The court's interpretation of this statutory language is that the thing given ("anything of value") need not have any specified value, so long as the business, transaction, or series of transactions in connection with which the bribe is given involves anything of value amounting to $5,000 or more.

Defendants are, of course, correct in noting that Section 666 cannot operate to impose criminal liability for acts occurring before the effective date of the statute. The prohibition against the enactment of *ex post facto* laws seen at Article I, Section 9 of the United States Constitution is so well-settled as to require no further comment thereon by this court.

Unfortunately for the defendants, the defect in the counts of the indictment related to Section 666 is easily cured. Counts 300, 302, 304, 306 and 308 state that the alleged payments were made "[f]rom on or about October 1984." In compliance with defendants' motion herein, the government will be required to prove at trial that the alleged payments were in fact made after the effective date of Section 666, October 12, 1984. A cursory review of the figures set forth in the indictment clearly confirms that even the series of transactions after October 12, 1984 involved in the indictment amount to more than $5,000 and clearly come within the purview of the language of Section 666. The court notes that evidence of the pre-October 12, 1984 occurrences insofar as the same pertain to the alleged violations of Section 666 may be admissible under the provisions of Federal Rules of Evidence 404(b)

### 2. No Overt Acts Support a Charge of Bribery or a Charge That the Payments Were Corruptly Given

█ The indictment charges that the defendants sought to influence the supervi-

---

**6.** The defendants do not challenge the counties' status as local governments under Section 666(b) which receive more than $10,000 annually in federal funds.

**7.** It is similarly undisputed by the government that the kickbacks, standing alone, would fail to meet the $5,000 minimum required by Section 666.

sors and reward the actions of the supervisors who awarded contracts to NMSC. Defendants assert that there is an insufficient allegation of overt acts in the indictment to show that the defendants intended to exercise any influence or control over the supervisors. In conjunction with their assertion that no overt acts are alleged, defendants argue that since Section 666 is a bribery statute and not a gratuity statute, the government must prove that the payments alleged were corruptly given.

As noted above, Section 666 has only recently been construed by two federal appellate courts and has only been considered by a handful of district courts; thus, many issues remain open regarding the application and interpretation of the statute. One court, considering the question of whether Section 666 is a bribery or gratuity statute, ruled as follows:

> Congress having remained silent on the subject of intent in Section 666, the court construes the provision ... which is labelled a "bribery" section in its title and which carries a penalty five times that provided in § 201's gratuity provisions—to carry the level of intent generally present in bribery: the government must prove that the defendant intended to influence the recipient's conduct in the course of his employ.

*U. S. v. Jackowe,* 651 F.Supp. 1035, 1036 (S.D.N.Y.1987).

The court has no quarrel with the defendants' view of Section 666. The construction defendants suggest is a reasonable interpretation of the statute. To rule, however, that the government has not "proven" its case under Section 666 would be a premature pronouncement by this court.

The government has set forth allegations in the indictment suggesting that the defendants sought to influence the supervisors of Monroe and Pontotoc Counties to continue awarding contracts to NMSC and rewarding the supervisors for granting said contracts to NMSC. Presumably, the government will offer proof at trial in support of the charges made out in the indictment. In the event that the government does not offer any proof to support the charges set out in the indictment, as noted above, Rule 29(a) permits the defendants the opportunity to make a motion for judgment of acquittal at the close of the government's case. Fed.R.Crim.P. 29(a).

### 3. Series of Transactions

■ The defendants allege that the indictment is also insufficient because there was no "series" of transactions with the supervisors amounting to $5,000, as required by Section 666. The defendants construe each of the alleged kickbacks made to the respective supervisors as separate, individual transactions which are totally unrelated. The government refutes this construction and avows that the extensive number of consecutive transactions with each supervisor may be construed as a "series" as contemplated by Section 666. The court views this line of argument as more properly suited for resolution at trial. Each party will be permitted at trial to offer proof of its interpretation of the transactions as a series *vel non,* and then the jury may resolve the issue. The court reiterates its opinion that the continuing and lengthy nature of the payoffs alleged in the indictment is more indicative of a "series" of transactions than of an unrelated number of separate and distinct bribes.

### 4. Constitutionality of Section 666

■ In novel fashion, defendants assert that Section 666 is somehow unconstitutionally vague, ambiguous and overbroad. This assertion is unsupported by any controlling or persuasive authority, except for the case of *United States v. Barquin,* 799 F.2d 619 (10th Cir.1986), in which the court did not reach the constitutional issue. In *Barquin,* the Tenth Circuit Court of Appeals merely ruled that Section 666, as then written, did not apply to Indian tribes. *Id.* at 621–622. After *Barquin,* Congress amended Section 666 to provide for its application to any Indian tribal government. *See* Pub.L. No. 99–646; 1986 U.S.Code Cong. and Admin.News 6138.

The ruling in *Barquin*, thus, is of no assistance in defendants' constitutional challenge of Section 666. Since the defendants offer no argument in support of their assertion that Section 666 is unconstitutional, this court must follow the example of the court in *Barquin* and decline to reach the constitutional issue. It is not the province of this court to offer conjecture upon possible constitutional flaws in the presumptively valid statutes enacted by Congress. *See Westmoreland, supra,* at 578.

## V.

## CONCLUSION

In closing, the court notes that the mail fraud charges set forth in the indictment are apparently sufficient under *McNally* and its progeny. The conspiracy charges and bribery charges also are sufficient to withstand the defendants' motion to dismiss. The bribery charges under 18 U.S.C. § 666, however, will be limited to those payments and transactions occurring after October 12, 1984, the effective date of Section 666. Should the government fail to prove its allegations, defendants may move for judgment of acquittal.

A separate order will be issued.