NORTHWESTERN NATIONAL INSURANCE COMPANY OF MILWAUKEE, WISCONSIN, Plaintiff,

v.

Michael J. ALBERTS, James R. Alberts, Cassandra M. Sheehan, Raymond Cosgrove, Penelope A. Boyle, John C. Maucere, Jerry Silva, Michael L. Metheny, H.U.A. Resources, Inc., Alton Jones, Arthur Lawson, John J. Muller, Michael J.

O'Connell, Randolph K. Pace, Southern Companies, Inc., Michael J. McCann, William Curran, James M. McCabe, Harold A. Thau, Patrick J. Rooney, Van Allen Capital Corp., and Robert T. Norton, Defendants.

Raymond COSGROVE, William Curran, James M. McCabe, John J. Muller, Robert T. Norton and Harold A. Thau, Counterclaim Plaintiffs,

v.

NORTHWESTERN NATIONAL INSURANCE COMPANY OF MILWAUKEE, WISCONSIN, and Allan Esrine (a/k/a Ivan Ezrine), Counterclaim Defendants.

No. 88 Civ. 3452 (RWS).

United States District Court, S.D. New York.

July 11, 1991.

Hart & Hume, New York City (Benjamin Lentz, of counsel), for plaintiff.

Irwin & Post, New York City (Frederick B. Polak, Robert A. Goodsell, George W. Keefer, III, of counsel), for Cosgrove Investors.

Brandeis, Bernstein, New York City (Hartley T. Bernstein, of counsel), for counterclaim defendant Allan Esrine.

## OPINION

SWEET, District Judge.

Plaintiff and counterclaim defendant Northwestern National Insurance Company ("Northwestern") has moved pursuant to Rule 56, Fed.R.Civ.P. for summary judgment dismissing the First Amended Counterclaim (the "counterclaim") of defendants and counterclaim plaintiffs Raymond Cosgrove ("Cosgrove"), William Curran ("Curran"), James M. McCabe ("McCabe"), John J. Muller ("Muller"), and Robert T. Norton ("Norton"), (collectively the "Cosgrove Defendants"), as well as for summary judgment of its claims against the Cosgrove Defendants. Additionally, counterclaim defendant Allan Esrine ("Esrine") moved pursuant to Rules 9(b), and 12(b)(6) to dismiss the counterclaim against him; in the alternative, pursuant to Rule 56(a), Fed.R.Civ. P., for summary judgment dismissing the counterclaim against him; and also joined in Northwestern's summary judgment motion. For the reasons set forth below, Northwestern's and Esrine's summary judgment motion is granted in part and denied in part.

### The Parties

Esrine is a resident of the State of New York.

Northwestern is a corporation organized under the laws of the State of Wisconsin with its principal place of business in the State of Wisconsin.

Norton is a lawyer, Cosgrove is president of a holding company, Curran is president of a mortgage company, McCabe is an industry analyst, and Muller is an executive for Wang Laboratories. All are New Jersey residents. Along with seventeen others, the Cosgrove Defendants were limited partners (the "Limited Partners") in Southern Pipelines Partners ("the Partnership"), an Oklahoma limited partnership formed for the purpose of constructing, owning and operating a pipeline for the transportation of natural gas in southern Oklahoma (the "Pipeline").

Among the general partners in the Partnership was Southern Pipeline Development, Inc. ("Development"), a subsidiary of Southern Reserve, Inc. ("Reserve").

### Prior Proceedings

On May 18, 1988 Northwestern filed this diversity action as surety to recover sums of money paid by it on behalf of its principals, the former Limited Partners, including the Cosgrove Defendants.

The Limited Partners filed an answer to the complaint in August, 1988. In an opinion of the court of July 7, 1989 ("July 7, 1989 Opinion"), the Cosgrove Defendants were granted in part leave to amend their initial response to the complaint by filing a counterclaim alleging fraud, breach of duty to disclose, breach of duty of good faith and fair dealing amounting to constructive fraud, and failure to liquidate collateral and/or apply the proceeds thereof on a pro-rata basis to offset the alleged debts.

On March 9, 1990, the court heard oral argument on three motions: a letter of the Cosgrove defendants seeking to resolve certain discovery disputes that was treated as a motion; Northwestern's motion for leave to amend to add a new count asserting its surety rights of exoneration and *quia timet* and for a preliminary injunction; and the Cosgrove defendant's motion to amend the counterclaim, filed on February 6, 1990.

The counterclaim added Esrine as a counterclaim defendant and asserted a fraud claim in Count I; a breach of fiduciary duty in Count II; breach of duty to disclose in Count III; a breach of duty of fair dealing in Count IV; intentional interference with contractual relations in Count V; aiding and abetting the breach of fiduciary duty in Count VI; state and federal statutory causes of action for securities fraud in

Counts VII, VIII, and IX; a violation of RICO in Count X; and failure to liquidate collateral and/or apply the proceeds thereof in Count XI.

In an opinion of June 25, 1990 (the "June 25, 1990 Opinion"), the court granted the motion to compel discovery, Northwestern's motion to amend and for preliminary injunction, and granted in part the motion to amend the counterclaim. An order of July 9, 1990, entered pursuant to the June 25 Opinion, required the Cosgrove Defendants to plead loss causation with respect to Counts I, III, IV, VI, VIII, and X of the Counterclaim.

The Cosgrove Defendants then moved for vacatur of the July 9 Order, and for reconsideration of the June 25 Opinion. In a memorandum opinion of August 29, 1990, the court ruled that the Cosgrove Defendants must plead loss causation with respect to Counts I and III, the common law fraud counts, and also with respect to Counts IV, V, and VI, the common law tort counts. With respect to Counts VII and IX, the memorandum opinion modified the July 9 Order to provide leave to amend to the extent such counts are based upon "control person" liability. The memorandum opinion granted leave to amend with respect to "seller liability" on the condition that the Cosgrove Defendants plead that Northwestern directly solicited the sales for each defendant.

The Cosgrove Defendants, joined by the other defendants in this action, appealed the Court's decision in the *quia timet* count. Northwestern subsequently filed a motion to dismiss the appeal. In an opinion of June 28, 1991, 937 F.2d 77, the Court of Appeals vacated the injunction based on *quia timet* as to the Cosgrove Defendants, and dismissed the appeal as to the remaining defendants-appellants.

On December 10, 1990, Esrine filed his motion to dismiss and for summary judgment. Upon agreement of the parties, Esrine's motions were taken on submission on March 4, 1991. On March 19, 1991 Northwestern filed its motion for summary judgment. Oral argument on the Northwestern motion was heard on May 23, 1991.

*The Facts*

The Partnership

The promoters and organizers of the Partnership were its general partners, Development, Van Allen Capital Corp. ("Van Allen"), and Michael Alberts ("Alberts"), Development's president and principal shareholder. Alberts was the president and principal shareholder of Reserve, which owned 50% of the stock in Development. Development had been formed in August of 1984 chiefly for the purpose of serving as a general partner in the Partnership.

The Partnership solicited potential investors in limited partnership interests by means of a Private Offering Memorandum dated October 11, 1984 (the "POM"). The POM described an offering of 37 limited partnership units at a purchase price of $200,000 per unit, and represented that the unit purchases would ultimately be financed by revenues that the operation of the Pipeline was expected to generate.

As part of their purchase price of the limited partnership units, the Limited Partners, including the Cosgrove Defendants, each executed and delivered promissory notes to the Partnership (the "1985 Notes") in the amount of $185,000 per unit. The Partnership then endorsed, assigned and negotiated these promissory notes to Equilease Corporation ("Equilease") in return for a $6,845,000 loan (the aggregate principal amount of the promissory notes) from Equilease to the Partnership.

In order for it to consent to purchase the 1985 Notes, Equilease required the limited partners to deliver a surety bond (the "1985 Bond") guaranteeing that the limited partners would make timely payments of principal and interest under the 1985 Notes. In order for Northwestern, as their surety, to issue such a bond on behalf of the Limited Partners as principals, each of the Limited Partners executed and delivered to Northwestern an application for surety bond which contained an agreement to indemnify the surety and an estoppel letter. The POM included among the ex-

hibits sample Northwestern bond applications and indemnity agreements.

The offering described in the POM closed on January 25, 1985 (the "1985 Closing"). Esrine attended the Closing, at which time he delivered the 1985 Bond to the Partnership and collected in exchange Northwestern's bond premium.

The Partnership made interest and principal payments on the Equilease loan through the spring of 1986, reducing the principal balance on the loan, and thereby reducing the balance due on each of the Limited Partners' notes. The Partnership was unable to meet payments due in June 1986 and thereafter.

On or about September 30, 1986, and on or about December 16, 1986, Equilease advised Northwestern that the Limited Partners had defaulted on their obligation under their promissory notes, and demanded payment from Northwestern pursuant to the 1985 Bond. Northwestern, as surety, made total payments of $2,095,688.66 to Equilease on behalf of the Limited Partners.

The 1987 Restructuring

In late December of 1986, Development and Reserve advised Northwestern and Equilease of a proposed restructuring of the Limited Partners' promissory notes negotiated to Equilease and bonded by Northwestern (the "Restructuring"). In general the Restructuring consisted of (1) the transfer of the Partnership's assets (including the Pipeline) to Reserve; (2) Reserve's borrowing of $6,845,000 from a new financial institution (the "1987 Loan"); (3) the assumption by the former Limited Partners of the $6,845,000 borrowing by execution of assumption agreements (the "Assumption Agreements") and their receipt of common stock in Reserve, as well as a promissory note payable to each limited partner in the amount of $50,000; (4) Northwestern's issue of a financial guarantee bond in favor of the new financial institution guaranteeing the payments due under the Assumption Agreements (the "1987 Bond"); (5) Reserve and Development indemnifying Northwestern against all loss, cost and expense it would incur by issuing a new fi-

nancial guarantee bond, and, as collateral security for their promise to indemnify, granting to Northwestern a first security interest/mortgage in the Pipeline; and (6) Reserve's undertaking to use the $6,845,-000 loan proceeds to pay Equilease the remaining monies due on the Limited Partners Promissory Notes (less a discount), reimburse Northwestern for the payment it had made to Equilease on behalf of the Limited Partners, and establishment of a fund of $700,000 to make improvements to the Pipeline.

The December 23 Letter

On December 23, 1986 Northwestern distributed to the Limited Partners a letter explaining the terms and conditions of the restructuring (the "Letter"). Counsel for Northwestern reviewed and commented on drafts of the Letter, which Alberts signed.

The Letter contained the following statements: (1) that the purpose of the Restructuring was to obtain an additional $700,000 with which to complete and improve the Pipeline, thereby enabling the Pipeline to generate sufficient funds to amortize the 1987 Loan; (2) that, upon a vote in favor of the Restructuring by a majority of the Limited Partners, all of the Limited Partners would be required to participate in the Restructuring on essentially the same terms, in proportion to their initial percentage investment in the Partnership; (3) that the Limited Partners would receive 10,000 shares of Reserve stock, and a note from Reserve for $50,000 payable *pari passu* with reductions in the $6,845,000 indebtedness from the 1987 Loan, with such payment anticipated to occur during 1987; (4) that Equilease would discount the Equilease Loan at a maximum of $500,000; (5) that the expenses and costs of the Restructuring would not exceed $225,000; (6) that the Pipeline and other assets transferred to Reserve pursuant to the Restructuring would stand as the primary security for the Cosgrove Defendants' obligations under the Assumption Agreements, and that the liability of the Cosgrove Defendants would stand as a reserve fund in case of the insufficiency of the assets to indemnify fully Northwestern in the event that it

would have to make payment pursuant to the 1987 Bond.

In its description of the Restructuring, the Letter allegedly omitted the following information: (1) that Reserve and Development would execute an indemnity agreement in favor of Northwestern; (2) that Reserve and Development would grant Northwestern a mortgage interest in the Pipeline; (3) that Reserve would incur additional debts over the $6,845,000 borrowing in connection with the Restructuring; (4) that approximately one-third of the Limited Partners would be forgiven their obligations in connection with the 1984 Loan and Bond; and that (5) counsel for Northwestern was simultaneously representing the Partnership.

On February 6, 1987, Reserve issued a comfort letter to the Cosgrove Defendants and other Limited Partners enclosing a copy of its investment banker's letter to Northwestern, which stated that the Equilease discount was $300,000.

The 1987 Closing

At the February 12, 1987 closing (the "1987 Closing"), Reserve executed and delivered to the Merchants Bank its promissory note (the "Reserve Note") in the principal amount of $6,845,000 plus interest, and a Pledge and Security Agreement both in favor of the Bank. Esrine procured Merchants Bank as a lender in the Restructuring. Pursuant to the terms of the Reserve Note, the $6,845,000 principal was to be repaid as follows: $2,280,000 on December 31, 1987; $2,280,000 on December 31, 1988; $2,285,000 on December 31, 1989. In addition, quarterly interest payments were to be due on the first day of March, June, September, and December in each of those years. The Reserve Note was secured by the Assumption Agreements executed by the Limited Partners, which were in turn secured by Northwestern's Bond delivered to the Merchant Bank.

To induce Northwestern to issue the Bond on their behalf, each of the Limited Partners executed an "Agreement with Surety" in favor of Northwestern. Pursuant to the "Agreement with Surety" among other things, the Limited Partners/principals requested Northwestern to issue a new bond on their behalf, and agreed to indemnify Northwestern in the event Northwestern suffered a loss by reason of its issuance of such a bond.

As a further inducement to Northwestern to issue the bond, Reserve and Development each executed an indemnity agreement dated February 12, 1987 (the "Indemnity Agreement") in favor of Northwestern pursuant to which, in effect, they both agreed to indemnify and hold harmless from all loss, cost and expense that Northwestern may incur as a result of issuing its bond on behalf of the makers of the Assumption Agreements. As security to Northwestern for their obligation under the indemnity agreement, Reserve and development also executed a "Mortgage, Assignment, Security Agreement and Financing Statement" (the "mortgage") pursuant to which Reserve and Development granted to Northwestern a first mortgage/security interest in the Pipeline.

On February 11, 1987, $247,000.84 was transferred from the E.F. Hutton account of Southern Completion Fund ("Completion"), a limited partnership of which Development is a general partner, Account No. A–12–13425–1, to the E.F. Hutton account of Southern Pipeline, Inc. On February 13, 1987, Reserve opened a new bank account at United Jersey Bank, Account No. 1800–142–4, with an opening balance of $698,603.88.

The $698,603.88 represented the sum of the following three checks: (1) a Merchants Bank check for $403,603.88 payable to Reserve; (2) a Chemical Bank check for $250,000 payable to Esrine and endorsed to Reserve; and (3) a $45,000 check from Idiico, a corporation controlled by Esrine, payable to Reserve. The above checks were received at the 1987 Closing.

In early April 1987, the Limited Partners' 1985 Notes, marked paid, were returned to them by Reserve. The loan agreement between Merchants Bank and Reserve dated February 12, 1987 shows payment of $4,153,743.47 via wire transfer to Equilease for the remaining obligation due under the Limited Partners' notes held by Equilease.

A total of $2,242,652.65 was paid to Northwestern. $2,095,688.66 represented reimbursement to Northwestern for its payment to Equilease on behalf of the Limited Partners; $24,380.99 represented interest on the amount; and $122,583.00 represented the increased premium for the Bond. In April, 1987 Equilease returned to Northwestern the Equilease Bond.

Reserve paid the quarterly installment of interest due Merchants' Bank on March 31, 1987, and June 30, 1987. Both Reserve and the makers of the Assumption Agreement (the Limited Partners) defaulted in making each of the subsequent interest payments and the first two annual installments of the principal. Northwestern, pursuant to its obligations under the Bond, made payments from November 15, 1987 through November 22, 1989 totalling $5,816,807.

In May, 1988 Reserve and Development filed petitions for reorganization under Chapter 11 of the U.S. Bankruptcy Code. In August 1988 these proceedings were transferred to the United States Bankruptcy Court for the District of New Jersey. In June, 1989, the New Jersey Bankruptcy Court converted the Chapter 11 reorganization into Chapter 7 reorganization proceedings. On April 14, 1989, the New Jersey Bankruptcy Court signed an order approving the abandonment of the Pipeline to Northwestern.

*Discussion*

With the exception of one of the counterclaims based on New Jersey securities law, the court will apply New York law, as the parties agreed to be bound by New York law in the agreements underlying the Restructuring.

I. *The Northwestern Summary Judgment Motion as to the Counterclaim*

Summary judgment is authorized if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Summary judgment is appropriate only in the circumstances where "the evidence is such that a reasonable jury could not return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,*

*Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party has the burden of demonstrating the absence of any genuine issue as to all the material facts, and the non-moving party is entitled to all favorable inferences that may be drawn from the evidence. *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 444–45 (2d Cir.1980).

A. Loss Causation

Northwestern seeks summary judgment dismissing eight out of the eleven counterclaims on the grounds that the Cosgrove Defendants have not demonstrated loss causation. If such showing is required as matter of law for the eight counterclaims, and the Cosgrove Defendants have not adduced evidence sufficient for such a showing, then summary judgment dismissing the counterclaim should be granted as a matter of law, as the remaining factual disputes relating to such claims would not then be material issues precluding summary judgment.

1. *Common Law Fraud and Securities Claims*

■ Loss causation, that is, that the alleged misrepresentations and omissions caused the economic harm, is a required element of both the common law and the securities counterclaims. *See Bennett v. United States Trust Co.,* 770 F.2d 308, 316 (2d Cir.1985); June 25, 1990 Opinion at 26–27, July 9, 1990 Order, and August 29, 1990 Opinion and Order at 3. Loss causation requires a showing that the alleged wrongs proximately caused the loss. *Thornock v. Kinderhill Corp.,* 749 F.Supp. 513, 516 (S.D.N.Y.1990). Therefore, the Cosgrove Defendants' first (common law fraud), third (constructive fraud), fourth (breach of duty of good faith), fifth (tortious interference with contract by aiding and abetting), sixth (aiding and abetting breach of fiduciary duty), eighth (federal securities fraud) and tenth (RICO) counterclaims, in order to survive a summary judgment motion, require a showing of facts from which a reasonable jury could infer loss causation.

### 2. *Breach of Fiduciary Duty Claims*

■ A plaintiff alleging breach of fiduciary duty, however, is not required to meet the higher standard of loss or proximate causation. *ABKCO Music, Inc. v. Harrisongs Music, Ltd.,* 722 F.2d 988, 995 (2d Cir.1983) (plaintiff need not meet loss causation standard where breach of fiduciary duty a prophylactic rule intended to remove all incentive to breach, not simply to compensate for damages in the event of a breach) (citing *Diamond v. Oreamuno,* 24 N.Y.2d 494, 498, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969)).

### 3. *The Determination of Loss Causation: The Improvements Fund*

■ The Cosgrove Defendants allege several misrepresentations and omissions as the basis for their counterclaim. Among the alleged misrepresentations are (1) that the primary objective of the restructuring was to obtain a $700,000 improvement fund and that this objective would be accomplished; (2) that all the limited partners would be required to participate in the restructuring; (3) that their investment obligation would be reduced by $50,000 by the end of 1987; (4) that the Equilease discount would not be materially less than $500,000; (5) that the soft costs (expenses incurred in the restructuring) would not materially exceed $225,000; (6) that Northwestern would look first to the pipeline, and second to the principals, for reimbursement; and (7) that the 1987 restructuring would be in accordance with the Partnership Agreement.

The alleged omissions include: (1) that Reserve and Development would execute an indemnity agreement in favor of Northwestern; (2) that Reserve and Development's obligations under the indemnity agreement would be collateralized by the first mortgage in the Pipeline; (3) that Reserve would be incurring debt in addition to the $6.845 million borrowing from the Merchants Bank; (4) that the obligations of approximately one third of the former Limited Partners under the 1985 transaction would be forgiven; and (5) that Elliott Newman, Esq. of the law firm of Finley, Kumble, Wagner, Underberg, Manley, Myerson & Casey was simultaneously representing both the Partnership in the Restructuring and Northwestern in another transaction.

Most of the alleged omissions and misrepresentations go to the issue of transaction causation. While such alleged omissions and misrepresentations might support an inference that the alleged violations caused the Cosgrove Defendants to participate in the transaction, they do not show not loss causation, namely, that such violations caused the transaction to fail. *See Bennett,* 770 F.2d at 313.

In *Bennett,* plaintiffs borrowed funds from the U.S. Trust Co. to purchase utility stocks which were then deposited with U.S. Trust as collateral. The stock declined in value, and ultimately U.S. Trust liquidated plaintiffs' account. The Bennetts not only lost their equity in the stock, but also became liable to U.S. Trust for $1,200,000 on unpaid interest and principal on their loan. The Bennetts sued U.S. Trust, alleging that in making the loan, U.S. Trust had knowingly misrepresented to them that the Federal Reserve margin requirements do not apply to public utility stock deposited with a bank as collateral. The Bennetts could not and did not allege, however, that U.S. Trust in any way recommended that they purchase public utility stock in general, or any particular public utility stock.

Likewise in the instant case, any alleged misrepresentations in which Northwestern may have participated about the structure of the Restructuring did not cause the Cosgrove Defendants' loss of their equity in Reserve. Instead, the failure to make the improvements to the Pipeline that would have increased Reserve's income caused this loss.

The instant case is therefore distinguishable from *Manufacturers Hanover Trust v. Drysdale Sec. Corp.,* 801 F.2d 13 (2d Cir.1986) (*"MHT"*). At issue in *MHT* was a report authored by defendant Arthur Andersen which misrepresented the assets of the investment vehicle. The Court of Appeals held that the plaintiffs had presented

evidence sufficient to link the misrepresentations to the plaintiffs' losses to support a jury verdict where the misrepresentations concerned the quality of the prospective investment, and not merely the "characteristics" of the investment. In contrast, in the instant case, most of the alleged misrepresentations and omissions went to the structure of the deal, and did not concern the likelihood of the Pipeline to increase the company's income. In short, in *MHT*, Arthur Anderson represented that the company had substantial assets when in fact it had a negative net worth; in the instant case, most of the alleged misrepresentations did not concern Reserve's worth as an investment.

■ Of the alleged misrepresentations and omissions, therefore, the ones that relate to the loss causation issue are those concerning the $700,000 fund (the "improvements fund"), which, the parties agree, was to be used to turn around the failed investment by allowing it to be connected to additional wells, thereby increasing the transportation fees with which to amortize the debt. Thus, in order to prove loss causation resulting from the alleged misrepresentations relating to the improvements fund the Cosgrove Defendants must show that (1) no $700,000 improvements fund was ever established and (2) that the investment would have turned around with the $700,000 of improvements.

The parties agree that Reserve failed to use the improvements fund for the purpose agreed upon, causing the Pipeline to fail to generate the additional income. Therefore, the question of whether Northwestern's role in the restructuring proximately caused the Cosgrove Defendants' losses turns on whether the improvements fund was properly established in the first place. If the improvements fund was properly established, then Northwestern's role in the restructuring did not proximately cause the alleged losses. *See Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 62 (2d Cir.1985) ("the failure of the corporation to use the proceeds wisely .. was hardly a reasonably foreseeable result, let alone the direct result, of any of Carro

Spanbock's alleged actions"); *Thornock*, 749 F.Supp. at 516 ("Likewise, the investors' losses here were caused not by FCNB's provision of financing, but rather by the Kinderhill defendants' alleged mismanagement of the investments.").

As recounted in the statement of facts above, on February 13, 1987, the day after the closing, Reserve opened a new bank account with an opening balance of $698,-603.88, representing the proceeds of three checks received at the closing the day before as stated above.

The Cosgrove Defendants contend that although the $698,603.88 fund was established, it was never viable or available. They argue that the closing costs of the restructuring were so high that they absorbed nearly all the proceeds of the 1987 Loan, leaving behind a balance insufficient to fund the improvements. In support of this contention, the Cosgrove defendants set forth evidence in the form of Alberts' deposition, in which he states that he would personally advance between $215,000 and $250,000 to Reserve, but that he would immediately reimburse himself after the closing from the loan proceeds. The loan documents show that no part of the loan proceeds went directly to Alberts.

In support of its position that the improvements fund was viable immediately after the closing, Northwestern submits loan documents and a cash disbursements schedule concerning (1) the disbursement of the loan proceeds and (2) withdrawals and deposits from the account in to which the $698,603.88 was deposited. The cash disbursements schedule, show that Reserve made two withdrawals from the account in February totalling $132,111.11, and thirteen withdrawals in March totalling $399,-174.28. The records show that Alberts made two deposits into this account, $105,-000 on March 16, 1987 and $450,000 on March 23, 1987. The net result of these deposits and withdrawals was that the balance of the account was $837,254.97 as of April 7, 1987, an amount well in excess of the $698,603.88 balance existing at closing.

Thus, even assuming that Alberts personally contributed (through entities con-

trolled by him) and later withdrew funds from the account as stated in his deposition, there is uncontroverted evidence that the balance in the account was in excess of $700,000 seven weeks after the closing. Northwestern submits evidence relating to the period after April 7 in the form of a letter from Reserve showing that Reserve continued to represent to Northwestern that $700,000 was preserved in a certificate of deposit. It is Northwestern's position that Reserve's statements about the certificate of deposit was a misrepresentation in that the certificate of deposit was used to collateralize a loan to Development and that this use of the $700,000 accounts for the failure to make the specified improvements.

Whatever the ultimate use of the funds, however, the evidence shows that the funds for improvement were available after the Closing, that Reserve continued to represent the availability of such funds, and that based on such representations, Northwestern had reasonable grounds to believe in the availability of such funds. In short, Alberts' deposition testimony notwithstanding, there is no evidence from which a reasonable jury could conclude that the funds were not available immediately after the closing. Therefore, the Cosgrove defendants have failed to point to a genuine issue of fact sufficient to preclude summary judgment on the claims for which loss causation is an element.

### B. Breach of Fiduciary Duty

■ The second count of the counterclaim alleges Northwestern's breach of a fiduciary duty to the Cosgrove Defendants, based on the fact that the Cosgrove Defendants each gave Northwestern certain limited powers of attorneys, as provided for in both the 1984 Indemnity Agreement and the 1987 Agreement with Surety.

The 1984 Indemnity Agreements provided that the Cosgrove defendants each appoint Northwestern:

as its attorney-in-fact with the right, but not the obligation, to exercise all rights assigned [in favor of Northwestern] ... and in the name of the undersigned to make, execute and deliver, but not be obligated, additional documents deemed necessary to give full effect to the assignment.

The Agreements with Surety likewise provided:

I hereby irrevocably appoint Northwestern as my attorney in fact to execute and deliver to the Bank, Southern Reserve, and any other person, firm or corporation, such written directions and/or instruments and documents as are reasonably required to effectuate the purposes of this Agreement.

The Cosgrove Defendants do not allege that Northwestern exercised such powers of attorney; they contend that by the grant of power of attorney, Northwestern became the Cosgrove Defendants' agent for the purposes of the specific transactions involved with each agreement and that therefore Northwestern had a duty to provide the Cosgrove Defendants with material facts relating to those transactions.

■ In general, a written power of attorney is a formal contract and creates a principal/agency relationship. However, an agency relationship only exists if the agent acts primarily for the benefit of the principal and not for himself. Restatement of Agency (2d) § 14(k) (1988). In the instant case, Northwestern was not merely acting as an agent of the Cosgrove Investors. As surety, Northwestern played an active role in both the 1985 and 1987 transactions. It stood to benefit from the transactions through the fees it charged. The purpose of the Cosgrove Investors grant of power of attorney to Northwestern was merely to facilitate the transaction.

Moreover, it is undisputed that the powers of attorney were never exercised. Courts have declined to hold the existence of a duty based on an agency relationship where the recipient of a grant of power of attorney never exercised such power. *See Stainton v. Tarantino,* 637 F.Supp. 1051, 1070 (E.D.Pa.1986) (no fiduciary relationship arose from attorney's acceptance of power of attorney where granted for the purposes of closing a restructuring and where such power never exercised). In

sum, the Cosgrove Defendants seek the court to hold as a matter of law that the grant of power of attorney to a surety gives rise to a fiduciary duty on the part of such surety. They point to no cases that stand for this proposition. Therefore, as a matter of law, Northwestern must be granted its motion for summary judgment dismissing this claim.

### C. Control Person Liability

Northwestern seeks summary judgment dismissing the seventh and ninth counterclaims on the grounds that it was neither a control person nor a seller under New Jersey Statutes 49:3–71 and § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2) (the "1933 Act"). Esrine has also moved for summary judgment dismissing these claims with respect to him.

#### 1. *Primary Liability*

■ Control person liability under the 1933 Act requires a showing that (1) the alleged control person actively participates in the overall management and operation of the alleged controlled entity and (2) that such control person actively participated in the fraud allegedly perpetrated by that entity. *Harrison v. Enventure Capital Group, Inc.*, 666 F.Supp. 473, 478 (W.D.N.Y.1987) (citing *Lanza v. Drexel & Co.*, 479 F.2d 1277 (2d Cir.1973) (en banc)). Moreover, Federal securities law concepts are to be used to define liability under the New Jersey statute, *Cola v. Terzano*, 129 N.J.Super. 47, 322 A.2d 195 (1974), as well as "control person" under the New Jersey statute, *Zendell v. Newport Oil Corp.*, 226 N.J.Super, 431, 544 A.2d 878 (1988).

In opposition to the motion, the Cosgrove Defendants have adduced memos between Esrine and Reserve in the summer of 1986 discussing the form that the proposed Restructuring was to take, as well as Northwestern's attorney's comments on drafts of the Restructuring documents, as evidence of Esrine's and Northwestern's respective control person status.

Northwestern contends that such evidence relating to pre-closing events is "irrelevant" to the admitted Reserve fraud—failing to use the $698,603.88 fund to construct any pipeline improvements—"since the purpose of the restructuring was accomplished." This argument, however, applies only to those claims for which loss causation is a necessary element. *See supra* Part I(A)(3), *infra* Part I(C)(3).

■ At the heart of the control person liability claims based on the primary violation is the Letter of December 23 setting forth the terms of the Restructuring, which, along with other documents and representations, the Cosgrove Defendants allege, caused them to participate in the Restructuring.

The evidence of the communications between Esrine and Reserve, demonstrating as it does that Esrine had a leading role in structuring the deal, is sufficient to support an inference that Esrine participated in Reserve's management and in the fraud for the purposes of the control person liability test. Moreover, the memos, in which Esrine advocates Northwestern's interests in the Restructuring (*i.e.*, "the curing of all defaults, the repayment to [Northwestern] of the $462,000 odd dollars of interest, the obtaining of liens on the pipeline and the general releases that would ensue" (Esrine Memo of November 10, 1986)) and in which Esrine refers to his efforts effecting collections for Northwestern, is sufficient to raise a question of fact as to whether Esrine was Northwestern's agent, and therefore as to whether Esrine's alleged control person liability may be imputed to Northwestern.

Northwestern cites *Zendell* for the proposition that entities that provide professional or other services to the parties to a transaction cannot be control persons under either Federal securities law or New Jersey law. In *Zendell*, a limited partnership was formed to engage in oil and gas exploration and production in Oklahoma and Kansas. When the venture turned unsuccessful, the limited partners sought rescission alleging, *inter alia*, violations of federal and New Jersey securities laws. In dismissing a claim against the seller's counsel, the court rejected the contention that the seller's attorneys were liable as "control persons" under the New Jersey Stat-

ute. The court noted that the law firm did not act as broker or underwriter, and that the law firm did not have a managerial position with, or investment in, the partnership. *Zendell,* 544 A.2d at 883.

■ *Zendell* is, however, distinguishable on the facts from the instant case. In contrast to the court's findings in *Zendell,* the Cosgrove Defendants here have pointed to facts sufficient to establish Northwestern's financial interest in the Restructuring: the improvement of Northwestern's position by taking a security interest in the Pipeline. The prospect of bettering its position in relation to the limited partners constitutes enough of a stake in the outcome to distinguish Northwestern's role in the Restructuring from the role of the attorneys in setting up the partnership in *Zendell.* Therefore, as the Cosgrove defendants have established facts from which Northwestern's and Esrine's control person status may be inferred, a question of material fact exists to preclude summary judgment.

### 2. *Esrine's Motion to Dismiss the Control Person Liability Counterclaims*

In addition to joining in Northwestern's summary judgment motion with respect to the control person liability claims, Esrine also seeks dismissal of these claims on statute of limitations grounds.

■ A plaintiff cannot sue a new defendant after the statute of limitations has expired as to that defendant. *Schiavone v. Fortune,* 477 U.S. 21, 25–32, 106 S.Ct. 2379, 2382–86, 91 L.Ed.2d 18 (1986). With respect to the § 12(2) claim, Esrine asserts as the applicable statute of limitations the One–Year/Three–Year Rule, which provides that claims are forever barred unless brought within three years of the date on which they accrued and within one year of discovery of the fraud. *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* —— U.S. ——, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) (applying One–Year/Three–Year Rule to actions under § 10(b)).

Assuming, without deciding, that the § 12(2) claim is governed by the One–Year/

Three–Year rule, the relevant dates for the purposes of such rule are February 12, 1987, the date of closing of the Restructuring; February 6, 1990, the date the Cosgrove Defendants filed their motion to add Esrine as a counterclaim defendant; and the period from November–January 1989–90, when the Cosgrove Defendants say they discovered Esrine's involvement during the course of depositions. The First Amended Counterclaim was served on Esrine in October of 1990.

■ When a plaintiff seeks to add a new defendant in an existing action, the date of the filing of the motion to amend constitutes the date the action was commenced for statute of limitations purposes. *Derdiarian v. Futterman Corp.,* 36 F.R.D. 192, 194 (S.D.N.Y.1964). Therefore, the Cosgrove Defendants' commencement of the action as against Esrine was within the three year part of the One–Year/Three–Year rule. Moreover, the action was brought within one year of the discovery of the fraud in late 1989. Therefore, as the Cosgrove Defendants action against Esrine meets both prongs of the One–Year/Three–Year rule, Esrine's motion to dismiss the § 12(2) claim is denied.

Esrine also seeks dismissal of the claims based on New Jersey Statutes 49:3–71, which provides a limitations period of "no more than two years after the contract of sale or within two years of the time when the person aggrieved know or should have known of the existence of his cause of action, whichever is later. New Jersey Statues 49:3–71(e).

■ New Jersey law is consistent with the Second Circuit in establishing the date of the filing of the motion to amend as the date of the commencement of the Cosgrove Defendants' action against Esrine. *Campbell v. Union Beach,* 153 N.J.Super. 434, 379 A.2d 1295 (App.Div.1977); *Ioannou v. Ivy Hill Park Section Four Inc.,* 112 N.J.Super. 28, 270 A.2d 295 (Law Div.1970). The question thus becomes whether the Cosgrove Defendants should have known of Esrine's participation before their discovery of such knowledge late in 1989.

Where, as here, the Cosgrove investors were diligent in pursuing discovery, and where knowledge of Esrine's involvement in the restructuring could not be gleaned from an examination of the Restructuring documents distributed to the Limited Partners, but requires a familiarity with meetings in which the Cosgrove Defendants did not participate, Esrine's alleged participation in the Restructuring could not have been known to the Cosgrove Defendants before discovery was well underway. Therefore, Esrine's motion to dismiss the New Jersey securities fraud claim is denied.

### 3. *Aiding and Abetting*

 The Cosgrove Defendants allege that in the alternative, Northwestern and Esrine aided and abetted in Reserve's § 12(2) violation. The elements of aiding and abetting a fraud under the federal securities laws consist of (1) securities fraud by a primary party; (2) knowledge of the fraud; and (3) substantial assistance in the achievement of its ends. *See IIT v. Cornfeld,* 619 F.2d 909, 922 (2d Cir.1980). The plaintiff alleging "substantial assistance" by the aider and abettor must allege that the acts of the aider and abettor proximately caused the harm upon which the primary liability is predicated. *Bloor,* 754 F.2d 57, 62. As set forth above, the Cosgrove Defendants have failed to set forth facts sufficient to support a finding of loss causation, *i.e.,* proximate causation. Therefore, with respect to the aiding and abetting claims, for the reasons set forth above, summary judgment is granted dismissing these claims against both Esrine and Northwestern.

### D. Northwestern's Duty to Offset

In the eleventh counterclaim, the Cosgrove defendants seek an offset against their alleged obligations to Northwestern in the amount of their proportionate interest in the Pipeline. The Cosgrove Defendants have not opposed Northwestern's summary judgment motion with respect to this claim. Therefore, the motion with respect to this claim is granted.

### II. *Esrine's Motion to Dismiss*

The court's grant of summary judgment dismissing the Cosgrove Defendants' counterclaims except for the control person liability counterclaims applies to the counterclaims as they are asserted as against both Esrine and Northwestern. Therefore, with the exception of Esrine's motion to dismiss the control person liability counterclaims, the court need not consider the remainder of Esrine's motion to dismiss the counterclaims.

### III. *Northwestern's Liability Claims*

Northwestern has also moved for summary judgment of its liability claims against the Cosgrove Defendants. There are several issues relevant to the disposition of Northwestern's claims against the Cosgrove defendants: (1) the Cosgrove Defendants' affirmative defenses (2) the factual issue of the valuation of the Pipeline; (3) the legal question as to the application of the proceeds of the Pipeline.

### A. Affirmative Defenses

 In *Celotex,* the Supreme Court set forth the standards to be met by parties opposing a summary judgment motion:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Thus, it is the Cosgrove Defendant's burden to establish that there are factual issues with regard to their affirmative defenses.

The Cosgrove Defendants have contested this motion with regard to two affirmative defenses, that based on fraudulent inducement and that based on failure of condition precedent.

### 1. *Conditions Precedent*

■ In support of its affirmative defense based on the failure of Northwestern's failure to fulfill conditions precedent to the agreement, the Cosgrove Defendants cite, among other cases, the case of *Holland Indus., Inc. v. Adamar of New Jersey, Inc.,* 550 F.Supp. 646, 648 (S.D.N.Y.1982) for the proposition that a contracting party's failure to comply with a condition precedent to an alleged contract bars its recovery for breach of that contract.

In *Holland,* the parties agreed that Holland would provide bus transportation services to Adamar. The court held the following language, contained in a "memorandum of understanding" between the parties to establish a condition precedent:

Holland understands that any service agreement with Adamar must be approved by the New Jersey Casino Control Commission and further, that Holland must apply for a New Jersey Casino Service Industry License. In the event of a denial of the above application, the agreement is terminated immediately at no cost or liability to Adamar.

*Id.* at 647–48. The other cases cited by the Cosgrove Defendants similarly concern service, renovation or purchase contracts. In the instant case, the Cosgrove Defendants point to no language in any of the documents underlying the Restructuring similar to that held to state a condition precedent in *Holland, i.e.,* which explicitly states that if a condition is not met, then the agreement is terminated. Therefore, as a matter of law, summary judgment must be granted to Northwestern on the issue of the affirmative defense based on condition precedent.

### 2. *Fraudulent Inducement*

The affirmative defense based on fraudulent inducement is based on the claim that the Cosgrove Defendants were fraudulently induced to enter into the Agreements with Surety, in which the former limited partners promised to indemnify Northwestern and thereby made Northwestern subrogee of the Assumption Agreements.

N.Y.U.C.C. § 3–201(1) (McKinney 1964) states that:

Transfer of an instrument vests in the transferee such rights as the transferor has therein, except that a transferee who has himself been a party to any fraud or illegality affecting the instrument … cannot improve his position by taking from a later holder in due course.

■ A surety may be a party to fraud for the purpose of barring his subrogation rights, even where the facts do not support of finding of loss or of control person or aider and abettor liability under the securities laws. *See National Union Fire Ins. Co. v. Turtur,* 892 F.2d 199, 206 (2d Cir. 1989) (affirming district court's view that surety who under the federal securities laws has no duty to disclose material misrepresentations to an investor may merely by remaining silent in the face of superior knowledge become a "party to fraud" as to disable it from enforcing its contractual subrogation rights); *Bruce v. Martin,* Opinion of April 13, 1990 at 14, 1990 WL 52180; *Gaines Service Leasing Corp. v. Carmel Plastic Corp.,* 105 Misc.2d 694, 432 N.Y.S.2d 760, 762 (Civ.Ct.1980), *aff'd,* 113 Misc.2d 752, 453 N.Y.S.2d 391 (N.Y.Sup. 1981).

■ There is sufficient evidence to raise an issue of fact as to whether Northwestern was party to fraud within the meaning of N.Y.U.C.C. § 3–201(1). The Letter of December 23 stated that in case of default triggering Northwestern's obligations to pay the Merchants Bank as the Cosgrove Defendants' surety, Northwestern would look first to the assets of Reserve (including the Pipeline) and then the Cosgrove Defendants for indemnification. The December 23 Letter, however, omitted to state that Northwestern, as a condition

of its bond guaranteeing payment of the Assumption Agreements, would also require an indemnification agreement from Reserve and Development holding Northwestern harmless from any losses that might arise from its role of surety to the Cosgrove Investors, and that as collateral security for Reserve's and Development's obligations under the Indemnification Agreement, Northwestern would be taking a first mortgage in the Pipeline. Such omissions are material where, as here, they affected the risk to the Cosgrove Defendants of entering into the Restructuring and consequently the decision to participate in the Restructuring.

By adducing evidence of the circulation of drafts of the Letter of December 23 between Northwestern and Reserve, the Cosgrove Investors have set forth facts from which it can be inferred that Northwestern knew of the alleged omissions. Therefore, the Cosgrove Investors have pointed to material issues of fact sufficient to preclude summary judgment of the fraudulent inducement issue.

**B. The Application of the Value of the Pipeline**

■ The Cosgrove Defendants further argue that even if they were not fraudulently induced into participating in the restructuring, Northwestern should nonetheless credit the value of the Pipeline pro rata among all the investors, instead of crediting the Pipeline's value first against the insolvent investors and only then against the solvent investors *i.e.*, the Cosgrove Defendants.

There is no dispute that (1) at the time of the Restructuring, Northwestern accepted as a partial replacement for those investors who did not wish to participate in the Restructuring several new investors who became principals under the 1987 Bond: H.U.A. Resources, Inc., Southern Companies, Inc., and Development, all controlled by Alberts; (2) Northwestern paid the entire $6,845,000 principal plus accrued interest on behalf of the Cosgrove Defendants and others to the Merchants Bank; and (3) the Bankruptcy Trustee of Southern Reserve has abandoned the Pipeline to Northwestern in partial satisfaction of the independent indemnity obligations of Southern Reserve to Northwestern.

The Cosgrove Defendants contend that Northwestern breached its duty to investigate the financial qualifications of the new investors, and that as a matter of law Northwestern is barred from recovery. They point to no case which stands for the proposition that a surety has such a duty.

■ In general, a surety has no fiduciary duty to its principal. *Turtur*, 892 F.2d at 207. A surety's failure to investigate financial information provided on a surety application does not in itself make it a perpetrator of fraud. *National Union Fire Ins. Co. v. Woodhead*, 917 F.2d 752, 757 (2d Cir.1990).

Moreover, notwithstanding the issue of fraudulent inducement, there is nothing contained on the face of the Assumption Agreement that indicates that the parties contemplated what the Cosgrove Defendants are seeking to accomplish by asserting the issue of a surety's duty to his principal: using the value of the Pipeline to offset their obligations under the Assumption Agreements. Paragraph 3 of the Assumption Agreements provides:

> It is further understood and agreed that the Promissor obligation hereunder shall be a primary obligation of the Promissor, and that the Promissor shall have no right of indemnification or contribution from, or subrogation against Southern Reserve, Inc. thereof or any other person, it being the intention and understanding of the Promissor that, to the extent of the Maximum Liability hereunder, the Promissor shall bear his portion of the ultimate risk of loss when due, as aforesaid.

For the reasons stated above, as a matter of law, and notwithstanding the issue of fraudulent inducement as discussed above, Northwestern has no duty to the Cosgrove Defendants such that it should offset the value of the Pipeline pro rata among the solvent and insolvent investors.

Therefore, with respect to the issue of the value of the Pipeline as it relates to Northwestern's claim, summary judgment is granted in favor of Northwestern as to the application of the Pipeline's value, with a factual issue remaining as to the actual value of the Pipeline.

*Conclusion*

For the reasons set forth above, Northwestern's and Esrine's motions for summary judgment dismissing the counter-claims of the Cosgrove Defendants is granted, except with respect to the counter-claims alleging control person liability. As stated above, Esrine's motion to dismiss the control person liability claims against him is denied. Northwestern's motion for summary judgment of its claims against the Cosgrove Defendants is denied, factual issues remaining as to the Cosgrove Defendants' affirmative defense based on fraudulent inducement and as to the value of the Pipeline.

It is so ordered.